[No. S138666. July 5, 2007.]

SHAOPING CORDER, Plaintiff and Appellant, v.
LISA R. CORDER, Defendant and Respondent.

LISA R. CORDER, Plaintiff and Respondent, v.
SHAOPING CORDER, Defendant and Appellant.

**COUNSEL**

Davis & Heubeck, Law Offices of John C. Heubeck and John C. Heubeck for Plaintiff and Appellant and for Defendant and Appellant.

Law Offices of Ronald E. Harrington, G. David Tenenbaum and Ronald E. Harrington for Plaintiff and Respondent and for Defendant and Respondent.

**OPINION**

BAXTER, J.—In a consolidated wrongful death action, one defendant settled with the decedent's wife and his adult daughter for an unapportioned lump sum of $1.1 million, and the two nonsettling defendants ultimately prevailed at trial. At a subsequent court proceeding, the wife and the daughter offered evidence pertaining to the allocation of the settlement proceeds. Based on testimony from third party witnesses claiming the decedent was unhappy in his marriage and intended to get a divorce, the trial court found the marriage was "on the verge of ending," even though there was no evidence the decedent had actually separated from his wife or filed for a legal separation or a marital dissolution. The court then allocated 90 percent of the settlement proceeds to the decedent's daughter and 10 percent to the wife. We granted the wife's petition for review, which challenged the trial court's judgment and the Court of Appeal's affirmance of that judgment.

We conclude, contrary to the wife's assertions, that the trial court did not violate statutory law or act in excess of jurisdiction in undertaking to apportion the settlement proceeds. We also find the court was not required to allocate the proceeds based solely on the evidence admitted at the trial against the nonsettling defendants or on the perceived contribution that each heir's damages claim supposedly made to the settlement amount. However, we further conclude the record fails to support the court's finding that the marriage between the decedent and his wife was about to end. Because that finding cannot be sustained, we reverse the judgment of the Court of Appeal and remand the matter to that court for further proceedings consistent with the views expressed herein.

---

FACTUAL AND PROCEDURAL BACKGROUND

Raymond Corder (Corder) married Shaoping (Sherry) Corder (Wife) in September 2000. Lisa R. Corder (Daughter) is Corder's adult daughter from a previous marriage. In May 2001, eight months after the marriage to Wife, Corder was killed in a construction accident.

Wife and Daughter separately filed wrongful death actions in Orange County against defendant Morrow Equipment Company (Morrow) and others. After the two actions were consolidated, Morrow settled with both plaintiffs for an unapportioned lump sum of $1.1 million. Wife and Daughter then entered into the following stipulation: "Following the verdict or settlement of the [wrongful death] case, should the Plaintiffs fail to agree on an allocation or apportionment of damages between the heirs, that either Plaintiff shall have the right to a further trial regarding the allocation or apportionment of damages among or between the Plaintiffs. Furthermore, either party may supplement their witness list by identifying witnesses not previously disclosed and that those witnesses may be called as witnesses at the further trial proceeding."

Wife and Daughter went to trial against the two remaining defendants. The jury found neither defendant was negligent, and judgment was entered in their favor. Shortly thereafter, Wife and Daughter began preparing for a further trial on apportionment of the $1.1 million settlement proceeds from Morrow. Meanwhile, Wife filed a separate action in the Los Angeles County Superior Court, seeking to quiet title to the proceeds. Daughter responded by moving to set a trial date in the Orange County case.

Over Wife's objection, the Orange County court ruled it had jurisdiction to apportion the settlement proceeds and set a hearing for that purpose. The court then indicated that, as part of the apportionment proceeding, it would consider not only the evidence it had heard in the wrongful death trial, but also, as the parties stipulated, new evidence that had not been previously presented. At the apportionment proceeding, much of the new evidence concerned Daughter's contention that Corder, at the time of his death, was contemplating dissolving his marriage to Wife because he suspected she was engaging in prostitution. Specifically, Daughter and Wife presented various witnesses who gave conflicting testimony regarding statements Corder allegedly made about his marriage and Wife prior to his death. There was no evidence, however, that Corder actually separated from Wife or acted to initiate a legal separation or a marital dissolution. Daughter also presented evidence of her relationship with Corder.

After hearing the evidence, the trial court filed a "judgment" containing the following findings and conclusions. "Evidence at the allocation Trial demonstrated two conflicting views of the Decedent's relationship to his wife, Shaoping Corder. Lisa Corder, Decedent's daughter, presented witnesses who testified that the Decedent intended to divorce his wife. According to them the Decedent felt that his marriage was a mistake because his wife had continued to work as a prostitute despite her promises to stop.[1] Witnesses also testified that Lisa Corder and her father had a very close relationship. Lisa Corder's argument was that since Decedent was on the verge of divorcing his wife, the wife's share of the proceeds should be reduced drastically from what it would otherwise have been.

"On the other hand, Shaoping Corder's witnesses indicated that the marriage was a good one and there was no intent manifested by the [Decedent] to divorce his wife. Shaoping Corder argued that because she would have been legally entitled to support from the Decedent during the marriage, the lion's share of the proceeds should go to her.

"Having considered the conflicting evidence presented and the arguments of counsel, the Court finds most persuasive and credible the evidence that the marriage between Shaoping Corder and Decedent was on the verge of ending. While it is true that Decedent had not yet filed for divorce or contacted an attorney, the Court finds that had the Decedent lived the marriage would have lasted a relatively short period of time given Decedent's belief, expressed to several persons, that his wife was working as a prostitute against his wishes. Decedent may not have expressed his state of mind to all of those close to him, but such is life. For reasons that are usually unknown, people often keep secrets from some close friends or relatives and not from others. The Court finds unpersuasive the contention that Lisa Corder's witnesses came into Court to commit perjury regarding the prostitution allegations.

"Given the above findings, the Court makes the following allocation as to the 1.1 million dollar settlement proceeds: Lisa Corder 90%. Shaoping Corder 10%. [¶] In making these findings the Court has considered the total loss that each Plaintiff suffered from the Decedent's death . . . ." (Capitalization of names omitted.) The trial court denied Wife's motions to vacate the judgment and to enter a different judgment or for a new trial. Judgment was entered accordingly.

Wife appealed the apportionment judgment and the denial of her posttrial motions. The Court of Appeal affirmed in a split decision. While all three

---

[1] Daughter's witnesses claimed Corder knew Wife engaged in prostitution before he married her.

justices agreed the trial court had jurisdiction to apportion the settlement proceeds, there was vigorous disagreement over the propriety of the apportionment. The majority concluded that (1) Daughter had standing to challenge the amount of Wife's share and was not estopped from doing so; (2) the evidence was sufficient to support the finding that Raymond Corder intended to divorce Wife; (3) the award was not excessive as to Daughter and inadequate as to Wife, given the decedent's intention to divorce, his close relationship with Daughter, and the fact that Wife's award was significantly more than she was likely to have received as spousal support following an eight-month marriage, had Corder not died; and (4) evidence of the settling defendant's motives was properly excluded. These conclusions prompted the dissenting justice to declare: "There is something profoundly wrong in allocating 90 percent of a wrongful death award to an adult child and only 10 percent to the widow or widower." Claiming the majority ignored California case law dealing with wrongful death damages, the dissenting justice contended that evidence of the decedent's mere intention to divorce Wife was irrelevant because the decedent had taken no concrete steps to effectuate or even initiate such action.

## DISCUSSION

We granted Wife's petition for review to address essentially three issues. First, does the trial court in a wrongful death action have jurisdiction to apportion among the plaintiffs the proceeds of *a settlement* obtained in the action, or is the court's authority otherwise limited to apportioning *an award of damages* in such an action? Second, in a proceeding to apportion a settlement, is the trial court limited to consideration of the evidence introduced in the wrongful death action itself or the evidence that the defendant considered in arriving at the amount of the settlement? Third, did the evidence at the apportionment proceeding here, including the testimony of the witnesses who claimed the decedent intended to divorce Wife, support the trial court's allocation of 90 percent of the settlement proceeds to Daughter and only 10 percent to Wife?

### A. *"Jurisdiction" to Apportion Settlement Proceeds*

■ Wrongful death actions are statutory in nature and governed by the Code of Civil Procedure.[2] Section 377.60 establishes a cause of action in favor of specified heirs of a person whose death is "caused by the wrongful act or neglect of another." The damages that may be awarded in a wrongful death action are those that, "under all the circumstances of the case, may be just." (§ 377.61.)

---

[2] All further statutory references are to this code unless otherwise indicated.

While each heir designated in section 377.60 has a personal and separate wrongful death cause of action, the actions are deemed joint, single and indivisible and must be joined together in one suit.[3] (*Cross, supra,* 60 Cal.2d at pp. 692–693.) Accordingly, "the court or jury must compute the damages, if any, by considering the pecuniary damage suffered by all the heirs and return a verdict for *one sum.*" (*Watkins v. Nutting* (1941) 17 Cal.2d 490, 498 [110 P.2d 384], italics added; see *Rickards v. Noonan* (1940) 40 Cal.App.2d 266, 271 [104 P.2d 839].) In view of the lump-sum nature of wrongful death awards, section 377.61 provides: "The court shall determine the respective rights in an award of the persons entitled to assert the cause of action."

Wife first contends that a settlement is not an award, and that section 377.61's failure to employ the phrase "an award or settlement" in the above quoted sentence indicates the Legislature did not intend to confer jurisdiction upon a trial court *in a wrongful death action* to apportion *settlement proceeds.* Because section 377.61 does not confer such jurisdiction, she argues, the only way a trial court is authorized to apportion a wrongful death settlement is in an action that is independent of the wrongful death action, such as an heir's separately filed interpleader or quiet title action. Wife also suggests that construing section 377.61 as allowing judicial apportionment of settlement proceeds in a wrongful death action would defeat an heir's right to a jury determination of disputed issues of fact relevant to the competing claims to a settlement fund where such issues were not presented to or considered by the jury in the wrongful death action. Thus, Wife evidently contends that section 377.61, by implication, either reserves or confers a right to a jury apportionment of any wrongful death recovery other than "an award."

■ As a preliminary matter, we address Wife's characterization of this issue as one of jurisdiction. Generally, when the state Constitution or a statute provides a right to a jury trial, a trial court's invalid denial or curtailment of that right is considered an act *in excess of jurisdiction* and reversible error. (See generally 7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 85, p. 86.) Section 377.61, however, represents "a 'procedural' and 'not jurisdictional' statute whose procedural provisions can be waived." (*Canavin v. Pacific Southwest Airlines* (1983) 148 Cal.App.3d 512, 536 [196 Cal.Rptr. 82] (*Canavin*), quoting *Cross, supra,* 60 Cal.2d at pp. 692–694 [addressing

---

[3] An heir who files a wrongful death action is required to properly join all known heirs in that action. (*Cross v. Pacific Gas & Elec. Co.* (1964) 60 Cal.2d 690, 692–693 [36 Cal.Rptr. 321, 388 P.2d 353] (*Cross*) [addressing former § 377]; *Ruttenberg v. Ruttenberg* (1997) 53 Cal.App.4th 801, 808 [62 Cal.Rptr.2d 78].) Any heir who fails in this burden may be liable to the heirs who were intentionally omitted from the suit. (*Ruttenberg, supra,* 53 Cal.App.4th at pp. 809–811.)

former § 377⁴].) In light of Wife's various assertions, we must decide whether the trial court acted either in excess of jurisdiction or in contravention of section 377.61 when it resolved the competing claims between Wife and Daughter and apportioned the $1.1 million in settlement proceeds.

In determining what the Legislature intended with section 377.61, we look first to the words of the statute. (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 83 [45 Cal.Rptr.3d 394, 137 P.3d 218].) Section 377.61 provides in full: "In an action under this article, damages *may be awarded* that, under all the circumstances of the case, may be just, but may not include damages recoverable under Section 377.34 [pertaining to a decedent's cause of action]. The court shall determine the respective rights in *an award* of the persons entitled to assert the cause of action." (Italics added.) True, section 377.61 omits express reference to settlements. But given that its first sentence undertakes to describe the damages that "may be awarded" in a wrongful death action, the circumstance that its second sentence employs the related term "an award" provides no compelling basis for distinguishing between awards and settlements as far as judicial apportionment is concerned. Indeed, the statutory language does not purport to prohibit judicial apportionment in a wrongful death action that is resolved through settlement. Nor does it suggest that jury apportionment is either authorized or required when a settlement occurs.

In this particular context, moreover, there appears no meaningful distinction between a lump-sum award and a lump-sum settlement. After a jury trial, the trial court must apportion an award among the heirs based on the pecuniary damages suffered by each heir. Similarly, after a settlement, the trial court must apportion the settlement proceeds based on the identical criteria—the pecuniary damages suffered by each heir. (See, e.g., *Kim, supra*, 139 Cal.App.4th 543.) Additionally, where, as here, a trial court has heard evidence of damages at the wrongful death trial against nonsettling defendants, having the same court apportion the heirs' recovery of an award and/or a settlement promotes judicial economy and efficiency, even if the court takes further evidence regarding the heirs' competing interests therein.

Notably, the relevant legislative history contains no suggestion the judicial apportionment provision was adopted to limit or otherwise alter existing decisional law that recognized the general equitable nature of apportionment proceedings and the specific propriety of judicial apportionment in wrongful

---

⁴ The Legislature first provided for judicial apportionment of ·awards in wrongful death actions as part of a 1949 amendment to former section 377. The original provision stated in relevant part: "The respective rights of the heirs in any award shall be determined by the court." (Stats. 1949, ch. 1380, § 4, p. 2402; see *Kim v. Yi* (2006) 139 Cal.App.4th 543, 546–547, fn. 3 [42 Cal.Rptr.3d 841] (*Kim*).)

death actions.[5] "The 1949 statutory amendment to provide for judicial apportionment appears based upon legislative acknowledgement of the respective heirs' competing interests in the lump-sum award. The amendment reflects a belief it was more desirable not to add to the jury's burden the task of apportioning the damages [citation], and the practical consideration the trial judge had already heard the evidence of the pecuniary loss as to each heir and thus was the most desirable party to apportion the damages. [Citations.] . . . [¶] . . . [The] legislative delegation of apportionment to the court is constitutional, promoting the nature of the remedy as envisioned by its creators without substantively depriving any heir of the right to a jury trial." (*Canavin, supra,* 148 Cal.App.3d at p. 533.) Thus, while the statutory provision is fairly viewed as codifying early case law establishing the propriety of judicial apportionment of wrongful death awards (see *ante,* fn. 5), neither its text nor its history suggests a purpose to limit the type of recovery appropriate for judicial apportionment, or an aim to expand the right to a jury trial to situations where none previously existed.

■ In view of the foregoing, we find no interpretive or other reasoned basis for construing section 377.61 as precluding a trial court in a wrongful death action from apportioning a recovery obtained through settlement. (Cf. *Estate of Rogers* (1972) 24 Cal.App.3d 69, 77 [100 Cal.Rptr. 735] [similarly concluding that compromise settlements fell within purview of a statute providing only that "damages . . . awarded" were separate property].) In any case, even apart from section 377.61, judicial apportionment of a wrongful death settlement falls squarely within the contemplation of section 578, providing that "when the justice of the case requires it, [the judgment may] determine the ultimate rights of the parties on each side, as between themselves."

Case law is consistent with the conclusion that trial courts may complete the adjudication of all contested issues in a wrongful death by determining the appropriate allocation of settlement proceeds between competing heirs.

---

[5] While it is settled that the parties to a wrongful death action have a right to trial by jury (*Canavin, supra,* 148 Cal.App.3d at p. 531; § 592), it appears equally settled that a proceeding to apportion the recovery in such an action "is equitable in character as well as akin to a special proceeding." (*Canavin, supra,* 148 Cal.App.3d at p. 534, fn. 10; see also *Kim, supra,* 139 Cal.App.4th at p. 550.) Indeed, long before section 377.61 and its 1949 predecessor provided statutory authorization for judicial apportionment in wrongful death actions, "the established procedure in this state where plaintiffs recovered judgment was for the court, in a separate proceeding, to apportion the amount to be awarded each heir." (*Canavin, supra,* 148 Cal.App.3d at p. 530, relying on *Watkins v. Nutting, supra,* 17 Cal.2d at p. 498.) Thus, judicial apportionment in a wrongful death action "is consistent with historical precedent which has relied upon the equity powers of the court in dividing such funds, regardless whether the recovery was the result of compromise, settlement, litigation instituted by a personal representative of the decedent as a statutory trustee for the heirs, or trial litigation pursued by any of the heirs." (*Canavin, supra,* 148 Cal.App.3d at p. 534, fn. 10.)

(E.g., *Kim, supra,* 139 Cal.App.4th at pp. 547–548 [determining that, in light of the statutory language and history, section 377.61 provides for judicial apportionment of settlement proceeds, whether the competing claims are between the heirs of single or multiple decedents]; *Smith v. Premier Alliance Ins. Co.* (1995) 41 Cal.App.4th 691, 698 [48 Cal.Rptr.2d 461] ["[w]hen the claims of all heirs are encompassed in a lump-sum settlement, the court has authority to apportion the settlement"]; *Estate of Kuebler v. Superior Court* (1978) 81 Cal.App.3d 500, 504 [146 Cal.Rptr. 481] ["the court has jurisdiction to apportion the settlement proceeds"]; see also *Canavin, supra,* 148 Cal.App.3d at p. 534, fn. 10].)

Although the foregoing decisions did not specifically address the issues raised here, Wife offers no authority contradicting their conclusions and statements. Instead, she relies on *Changaris v. Marvel* (1964) 231 Cal.App.2d 308 [41 Cal.Rptr. 774] (*Changaris*) to argue the competing claims of heirs to a settlement fund "can only be resolved by a court that has subject matter jurisdiction over the dispute—subject matter jurisdiction conveyed by bringing a separate interpleader or quiet title action." *Changaris* involved a situation where one attorney had represented five different heirs in a wrongful death action. The heirs settled with the defendant tortfeasor for a lump-sum amount, but subsequently could not agree on its allocation. Facing a clear conflict of interest, the attorney filed an interpleader action and was discharged from further responsibility. (*Changaris, supra,* 231 Cal.App.2d at p. 310.) *Changaris* held, in the context of the interpleader action, that "the trial court properly received evidence of the damage suffered by each of the parties whose rights had been compromised, and the evidence so taken supports the apportionment made." (*Id.* at p. 313.)

Like the Court of Appeal below, we find *Changaris* unhelpful to Wife's position. Even assuming a separate interpleader action was appropriate for the type of situation presented in *Changaris*, that decision does not suggest that, where recovery in the wrongful death action is obtained by settlement and not by an award, the filing of an independent interpleader or other action is *required* to confer jurisdiction on a trial court to apportion the recovery.[6]

---

[6] Wife further argues that a separate action should be required so that competing heirs can be given fair notice of the nature of the competing claims, full discovery, and an opportunity at summary adjudication. But she fails to establish that fair notice, a reasonable opportunity for discovery, and trial court rulings akin to summary adjudication are unavailable or unobtainable in a wrongful death action. The proceeding below, we observe, did not appear to suffer from these perceived deficiencies.

Although Wife does not appear to assert a constitutional right to a jury trial on the issue of apportionment,[7] she does contend that judicial apportionment of a settlement threatens to deprive litigants of an asserted right under section 592 "to have a jury determine issues of fact . . . , *if* the judge is permitted to make a determination of the value of each heirs' [*sic*] claims independent of the factors used to reach the settlement." For the reasons below, we conclude section 592 does not provide an alternative statutory basis for jury apportionment of a settlement or for requiring a jury determination of all facts relevant to such an apportionment.

Section 592 provides in full: "In actions for the recovery of specific, real, or personal property, with or without damages, or for money claimed as due upon contract, or as damages for breach of contract, or for injuries, an issue of fact must be tried by a jury, unless a jury trial is waived, or a reference is ordered, as provided in this Code. Where in these cases there are issues both of law and fact, the issue of law must be first disposed of. In other cases, issues of fact must be tried by the Court, subject to its power to order any such issue to be tried by a jury, or to be referred to a referee, as provided in this Code."

■ Like the constitutional provision (Cal. Const., art. I, § 16), section 592 is historically based and does not expand the jury trial right beyond its common law scope. (*Crouchman v. Superior Court* (1988) 45 Cal.3d 1167, 1174 [248 Cal.Rptr. 626, 755 P.2d 1075]; see generally *ante*, fn. 7.) Accordingly, section 592 provides no independent basis for a right to a jury in the apportionment of wrongful death settlement proceeds. Furthermore, to the extent Wife assumes a separate interpleader action or a separate quiet title action would afford the right to a jury, she is wrong. (*Union Mutual Life Ins. Co. v. Broderick* (1925) 196 Cal. 497, 502 [238 P. 1034] [interpleader]; *Thomson v. Thomson* (1936) 7 Cal.2d 671, 681 [62 P.2d 358] [quiet title action when possession of the property not involved]; see *Estate of Phelps* (1990) 223 Cal.App.3d 332, 340 [273 Cal.Rptr. 2] [quiet title].)

*Kim*, *supra*, 139 Cal.App.4th 543, offers additional reasons for rejecting section 592 as a basis for jury involvement in the apportionment context. As *Kim* recognizes, proceedings to apportion a settlement fund among heirs are not actions "for injuries" within section 592's contemplation, because they

---

[7] Our state Constitution expressly guarantees the right to a jury trial. (Cal. Const., art. I, § 16.) But the right guaranteed is that of a jury trial as it existed at common law, when the state Constitution was first adopted. (*Cornette v. Department of Transportation* (2001) 26 Cal.4th 63, 75–76 [109 Cal.Rptr.2d 1, 26 P.3d 332].) Consequently, the constitutional right to a jury trial does not apply to actions in equity (*Matter of Coburn* (1913) 165 Cal. 202, 219 [131 P. 352]) or to special proceedings (*Cornette*, *supra*, 26 Cal.4th at p. 76), although the Legislature may provide for a jury trial in these situations by statute (*ibid.*; *Estate of Dolbeer* (1908) 153 Cal. 652, 657 [96 P. 266].)

typically involve no allegation of injury infliction or wrongdoing by one heir against other heirs. (*Kim, supra,* 139 Cal.App.4th at p. 549.) Such proceedings simply concern two or more heirs who, as wrongful death plaintiffs, may or may not agree on the distribution of the recovery obtained and seek a determination as to the proper apportionment. (See *ibid.*)

Also relevant here is *Kim*'s rejection of the contention that heirs are entitled to a jury "to decide the amount of damages each . . . suffered, according to the rules applicable to wrongful death damages." (*Kim, supra,* 139 Cal.App.4th at p. 549.) As *Kim* explains, "[t]his is an action for apportionment. The amount of damages was determined by the settlement, and no jury can now decide, as if in the first instance, the amount each plaintiff might have been entitled to recover from the alleged [settling] tortfeasors. Appellants argue that 'the fact that the monies are available for disbursement does not negate [their] right to have a jury decide their damages.' They are wrong. They gave up their right to have a jury decide their damages when they settled the wrongful death case. The only issue remaining is, indeed, apportionment. The fact that the apportionment will be made according to the law on wrongful death damages does not change that." (*Ibid.*)

In sum, we conclude the trial court did not act in contravention of section 377.61 or in excess of jurisdiction when it apportioned the settlement proceeds between Wife and Daughter.

### B. *Allocation Based on Contribution of Each Heir's Claim to the Settlement Fund*

Wife contends the trial court erred in apportioning the settlement fund based on evidence of the decedent's alleged intent to divorce her, because that evidence was not introduced in the wrongful death action itself or considered in arriving at the amount of the settlement. To support this contention, she relies on the following passage from *Changaris, supra,* 231 Cal.App.2d at page 313: "[W]hether the lump sum be ascertained by trial or by compromise, no plaintiff can have any proper reason for contesting the right of any other plaintiff. If a party be defeated in his right to share, that does not increase the right of any other to a larger award. *The right of each party plaintiff to recover, as well as the amount rightfully to be recovered, is separate and apart from the like rights of all the others and is neither added to nor lessened by the success or failure of any other party in establishing a right to recover or in proving the amount to be awarded under such right.*" (Italics added.) This passage, Wife argues, establishes a rule that prohibits heirs from attempting to increase their damages by attacking the claims of other heirs and precludes the trial court from allocating a settlement based on

evidence the alleged tortfeasor did not consider in calculating the settlement amount. In other words, she explains, a trial court must allocate a settlement by considering the relative contribution that each heir's claim made to the settlement fund, just as the trial court's role after a wrongful death jury award is to make an allocation that reflects the extent to which each heir's claim for damages contributed to the total award.[8] We find multiple reasons for rejecting these contentions.

■ First, Wife overlooks a significant fact in this case. Wife and Daughter, while represented by separate counsel, entered into a stipulation providing, in the event they could not agree on an allocation of damages following the verdict or settlement of the wrongful death action, that either party would have the right to a further trial regarding apportionment, and that either party could call additional witnesses not previously disclosed. Reasonably viewed, their stipulation reflected an agreement that resolution of the competing interests of Wife and Daughter in the $1.1 million settlement could be based on consideration of otherwise admissible testimony from witnesses who did not testify at the trial against the nonsettling defendants. We see no reason why this stipulation should not be honored. (See *Cohn v. Bugas* (1974) 42 Cal.App.3d 381, 392 [116 Cal.Rptr. 810]; *Bemer v. Bemer* (1957) 152 Cal.App.2d 766, 771 [314 P.2d 114] [a stipulation may lawfully include or limit the issues to be tried, whether or not such issues are pleaded].)

Second, we find the reasoning of *Changaris* flawed because it fails to recognize that heirs may have competing interests in a settlement fund, which will often be less than the sum of the separate claims. As the Court of Appeal reasoned below, "In the face of this reality, the *Changaris* court inexplicably denied the existence of *any* adversity between the wrongful death plaintiffs, saying 'no plaintiff can have any proper reason for contesting the right of any other plaintiff.' (*Changaris, supra,* 231 Cal.App.2d at p. 313.) If that proposition were true, a statutory provision for judicial apportionment would be [largely] unnecessary. Courts adjudicate disputes, and disputes do not arise unless the litigants' respective interests are adverse. [¶] The *Canavin* court identified the potential tension between coplaintiffs in a wrongful death case

[8] In this regard, Wife contends that, to the extent the trial court had the jurisdiction and authority to allocate the settlement proceeds, it should have based its decision on the evidence that (1) at the wrongful death trial, Wife was the only one with a claim for Corder's loss of earnings; and (2) according to defendant Morrow's attorney, Morrow made its settlement on the strength of Wife's claim, not Daughter's claim, and if Wife's loss of earnings claim had not been established, the settlement sum, if any, would have been one-tenth as much. Wife further contends the trial court should not have considered the disputed evidence of Corder's intent to divorce because it was not a factor disclosed at the wrongful death trial against the two nonsettling defendants and was not known or considered by Morrow when arriving at its settlement amount.

as the *raison d'etre* for judicial apportionment. 'The 1949 statutory amendment to provide for judicial apportionment appears *based upon legislative acknowledgment of the respective heirs' competing interests in the lump-sum award.*' (*Canavin, supra,* 148 Cal.App.3d at p. 533, italics added.) And quite obviously, competing interests cannot be adjudicated unless litigants are entitled to challenge their adversary's position."[9]

Third, the assessments and intentions of a settling defendant are irrelevant to the merits of the heirs' competing claims; therefore, they deserve no consideration in a judicial apportionment proceeding. Just as a defendant "has no interest in the division which the plaintiffs may make among themselves, or which may be made for them, of the damages recovered" in a wrongful death trial (*Robinson v. Western States Gas etc. Co.* (1920) 184 Cal. 401, 410 [194 P. 39]; see *Canavin, supra,* 148 Cal.App.3d at p. 537), so, too, the division of a lump-sum wrongful death settlement is of no concern to the settling defendant (*Smith v. Premier Alliance Ins. Co., supra,* 41 Cal.App.4th at p. 698; *Spearman v. State Farm Fire & Casualty Co.* (1986) 185 Cal.App.3d 1105, 1113, fn. 3 [230 Cal.Rptr. 264]). Indeed, a defendant's offer to settle may be based on inadequate information due to incomplete discovery, or a failure to reasonably investigate the claims, or some other consideration having little to do with the merits of the heirs' competing claims. Thus, whether or not the heirs have stipulated to the introduction of additional witness testimony on the issue of apportionment, the trial court's decision should not be dependent upon what a settling defendant considered relevant in calculating a compromise sum.

Wife also relies on *Collins v. Hemet Valley Hospital Dist.* (1986) 186 Cal.App.3d 922 [231 Cal.Rptr. 92] (*Collins*) to support her position. In that case, the trial court granted a petition filed on behalf of a decedent's minor child for approval of a $100,000 settlement with a defendant in a wrongful death action; it then issued a second order determining that the parents of the decedent, who filed the action along with the minor, were not heirs or "dependent parents" of the decedent and therefore were not entitled to share in the settlement. (*Id.* at pp. 925–926.) *Collins* reversed, finding: "*The trial court was not called upon to determine whether Mr. and Mrs. Collins were actually 'dependent' parents of the decedent.* That would have been a proper question to be determined in a trial of the wrongful death action, but there was no trial; there was a settlement based not on actual facts but claimed facts, and the fairness of the proposed settlement and division of the proceeds

---

[9] Strictly speaking, the relationship between heirs in wrongful death actions is not wholly adverse given the mandatory joinder burden. (See *ante,* fn. 3.) However, once the joinder burden is satisfied, heirs ordinarily have no duty to each other with respect to advancing their respective claims for damages. (See *Watkins v. Nutting, supra,* 17 Cal.2d at p. 499.)

should have been determined on the basis of the claimed facts and the circumstances that produced the settlement offer." (*Id.* at p. 928.)

*Collins* is not on point. Unlike the case before us, *Collins* concerned a guardian ad litem's petition for court approval of a settlement of a minor's claim, and, presumably, the showing required for such approval. (§ 372 [guardian ad litem may compromise a minor's claim with court approval]; see Cal. Rules of Court, rule 7.950 [requirements for petitions for approval of a compromise of a minor's claim].) Moreover, while *Collins* purported to speak to the issue of apportionment, it did not involve any stipulation between the decedent's parents and the minor's guardian ad litem for a further trial on apportionment, so it is unclear how *Collins* might have ruled had "[t]*he trial court [been] called upon to determine whether Mr. and Mrs. Collins were actually 'dependent' parents of the decedent.*" (*Collins*, *supra*, 186 Cal.App.3d at p. 928.) Finally, *Collins* did not identify any case law or other authority in reaching the conclusions quoted above. Accordingly, *Collins* fails to provide meaningful support for Wife's contrary views.

We conclude the trial court was not required to allocate the $1.1 million in settlement proceeds based solely on the evidence admitted at the trial against the nonsettling defendants or on the perceived contribution that each heir's damages claim supposedly made to the settlement amount.

C. *Testimony Regarding Decedent's Intent to Divorce and Sufficiency of the Evidence to Support the Trial Court's Allocation*

As relevant here, the trial court explained its allocation decision as follows: "Lisa Corder, Decedent's daughter, presented witnesses who testified that the Decedent intended to divorce his wife. According to them the Decedent felt that his marriage was a mistake because his wife had continued to work as a prostitute despite her promises to stop. . . . [¶] On the other hand, Shaoping Corder's witnesses indicated that the marriage was a good one and there was no intent manifested by the [Decedent] to divorce his wife. . . . [¶] Having considered the conflicting evidence presented . . . , the Court finds most persuasive and credible the evidence that the marriage between Shaoping Corder and Decedent was on the verge of ending. While it is true that Decedent had not yet filed for divorce or contacted an attorney, the Court finds that had the Decedent lived the marriage would have lasted a relatively short period of time given Decedent's belief, expressed to several persons, that his wife was working as a prostitute against his wishes." (Capitalization of names omitted.) As these findings indicate, the trial court focused on the disputed evidence regarding Corder's state of mind and his intentions shortly before his death. The court did not consider any evidence purporting to show that Wife actually engaged in prostitution.

In this court, Wife asserts the evidence at the apportionment proceeding, especially the testimony regarding Corder's alleged intent to divorce her, did not substantially support the trial court's allocation of only 10 percent of the settlement fund to her and the remaining 90 percent to Daughter. In this regard, Wife argues a surviving spouse's claim for future financial support cannot be reduced based on a decedent spouse's unacted-upon expressions of an intent to obtain a dissolution of the marriage at some point in the future.

Before elaborating on Wife's contentions, we find it useful to review the rules governing the recovery available in wrongful death actions. As a general matter, damages for wrongful death " 'are measured by the financial benefits the heirs were receiving at the time of death, those reasonably to be expected in the future, and the monetary equivalent of loss of comfort, society and protection.' " (*Benwell v. Dean* (1967) 249 Cal.App.2d 345, 349 [57 Cal.Rptr. 394] (*Benwell*).) Specifically, this means that "[n]o damages can be given for the pain or anguish suffered by the person who is killed, the damages . . . being limited to the pecuniary loss suffered by the person or persons for whose benefit the right of action is given by reason of the death of the victim. [Citation.] This pecuniary loss may be a loss arising from a deprivation of something to which the statutory beneficiary would have been *legally* entitled if the person had lived, or it may be a pecuniary loss arising from the deprivation of something which, from all the circumstances of the particular case, it could reasonably be expected such beneficiary would have received from the deceased had his life not been taken—even though the obligation resting on the deceased to bestow such benefit may have been but a *moral* obligation. [Citations.] Thus, there might be a reasonable expectation that if the life of a deceased had continued he might have accumulated a greater estate, and that the increased estate would have been inherited by the statutory beneficiaries as his heirs. Or, there might be a reasonable expectation that if the life of a deceased had not been taken the statutory beneficiaries, or some of them, would have continued to receive from the one who was killed financial assistance, or services having a financial value. These are illustrations of *direct* financial benefits for the loss of which damages may be awarded." (*Griffey v. Pacific Electric Ry. Co.* (1922) 58 Cal.App. 509, 516–517 [209 P. 45] (*Griffey*).)

In addition to these types of direct financial benefits, "there is that less tangible and not so immediate, but nevertheless real, pecuniary benefit which often may reasonably be expected from a continuance of the 'society, comfort and protection' of the deceased." (*Griffey, supra*, 58 Cal.App. at p. 517.) The pecuniary value of the society, comfort, and protection that is lost through the wrongful death of a spouse, parent, or child may be considerable in cases where, for instance, the decedent had demonstrated a "kindly demeanor" toward the statutory beneficiary and rendered assistance or "kindly offices" to that person. (*Beeson v. Green Mountain G. M. Co.* (1880) 57 Cal. 20, 38

[opn. on rehg.].) In this regard, however, recovery is not available in wrongful death actions for the grief or sorrow attendant upon the death of a loved one. (See *Krouse v. Graham* (1977) 19 Cal.3d 59, 69 [137 Cal.Rptr. 863, 562 P.2d 1022].)

*Powers v. Sutherland Auto Stage Co.* (1923) 190 Cal. 487 [213 P. 494] (*Powers*) illustrates the distinction between the tangible and intangible benefits of a marriage relationship, and the circumstances that are relevant in assessing the pecuniary value of their loss. In *Powers*, a husband and wife had been living separate and apart for over 13 years, although they had not legally separated or divorced. The wife had not received any significant or consistent support from the husband during that time, and did not know his whereabouts in the years before he died. In addition, the husband had been living in "illicit relations" with and supporting another woman for three or four years prior to his death. (*Id.* at p. 489.)

Despite these circumstances, *Powers* concluded the husband's death had caused the wife to suffer pecuniary loss of her legally enforceable right of support. As *Powers* explained, even though the husband had deserted the wife and for a long time contributed nothing to her support, and even though he may have intended never to return, "yet so long as the marriage relation existed she was entitled to support from him in the absence of any evidence that she had forfeited the right by her own wrong. This was a right which she could at any time during his life have legally enforced. It was a right created by the marriage relation and would exist so long as the marriage relation itself existed." (*Powers, supra*, 190 Cal. at pp. 489–490; but see *Carr v. Pacific Tel. Co.* (1972) 26 Cal.App.3d 537, 544–545 [103 Cal.Rptr. 120] [indicating in dictum, and without reference to *Powers*, that evidence of husband's abandonment and nonsupport of family was relevant to issue of damages for loss of earnings].)

While finding that an award of approximately $15 per month over the husband's estimated life expectancy was reasonable as compensation for the wife's loss of her right of support, *Powers* determined that a different conclusion was warranted regarding any claimed loss of the intangible benefits of the marriage: "In view of the fact that the [wife] and deceased had been living apart, nothing could have been awarded to [her] for the loss of the society, comfort, and protection of the deceased." (*Powers, supra*, 190 Cal. at p. 491.) This conclusion is consistent with other decisions recognizing that factors relevant in assessing a claimed loss of society, comfort, and protection may include the closeness of the family unit at issue, the warmth of feeling between the family members, and the character of the deceased as " 'kind and attentive' " or " 'kind and loving.' " (*Krouse v. Graham, supra*, 19 Cal.3d at p. 68, and cases cited therein.)

■ Here, Wife concedes the quality of her marriage and Corder's state of mind toward her may have some bearing on a claim for loss of society, comfort, and protection. Based on *Powers* and the case law above, we agree. (See also *Benwell, supra,* 249 Cal.App.2d at p. 349 ["evidence of the nature of the personal relationship that existed between the decedent and the beneficiaries of a wrongful death action has a bearing on the compensation for loss of society, comfort and protection, and is therefore ordinarily admissible in such an action"]; *id.* at p. 350 ["if it is proper for the beneficiary to produce evidence of the attitude and affection on the part of the decedent for the beneficiaries . . . then defendant should properly be able to rebut or negate such evidence"].) Accordingly, evidence of a decedent's intent to seek a divorce, as well as other evidence reflecting a strained relationship, may not be categorically excluded from the determination of a surviving spouse's wrongful death damages.

Nonetheless, Wife contends the evidence concerning Corder's intent to seek a divorce should not have been considered with respect to her claim for loss of the right of support. As in *Powers*, she argues, such support was a direct financial benefit to which she was legally entitled by virtue of her marital status at the time of Corder's death. Alternatively, she asserts, a decedent's expression of an intent to divorce a spouse deserves consideration only where there is evidence the decedent engaged in affirmative action that manifested such intent. In this case, she emphasizes, there was no evidence that Corder had initiated a marital dissolution or separation.

■ We do not view *Powers*, *supra*, 190 Cal. 487, as compelling the conclusion that, so long as a marriage relationship remains legally intact at the time of the decedent's death, evidence of the decedent's declared intent to end the marriage deserves no consideration in evaluating the surviving spouse's claim for loss of future financial support. Nor do we adopt such a conclusion here. As the wrongful death statute expressly contemplates, damages must be assessed based on the totality of the circumstances in each case. (§ 377.61 [recoverable damages in a wrongful death action are those that, *"under all the circumstances of the case,* may be just" (italics added)].) Evidence that tends to show that a marriage is on the brink of being legally terminated appears to be material and to bear directly on the issue whether financial support is properly found a benefit " 'reasonably to be expected in the future' " had the decedent lived. (*Benwell, supra,* 249 Cal.App.2d at p. 349.)

At the same time, there is merit to the concern that evidence of a decedent's mere expression of a desire to divorce a spouse, when the decedent had taken no steps to effectuate a marital dissolution or legal separation, seems a speculative basis for finding that a marriage would have

been short-lived had the decedent not died. As Wife points out, the reasons why couples stay married are complicated and personal, just as are the reasons why and when they get divorced. And as the dissenting justice below commented: "No doubt there are some relationships where the spouses form an intention to divorce on a daily basis, and the intention evaporates just as quickly. Mere intentions can be wonderfully evanescent." Moreover, we are mindful that California has a public policy in favor of promoting marriage. Thus, even when spouses have formally commenced the process of legal separation or marriage dissolution, the governing law contemplates the possibility of reconciliation as " 'the important issue.' " (*In re Marriage of McKim* (1972) 6 Cal.3d 673, 679 [100 Cal.Rptr. 140, 493 P.2d 868]; see 61 Ops.Cal.Atty.Gen. 36, 38 (1978) [California eliminated the concept of fault in marriage dissolutions "in order to reduce the emotionally charged atmosphere and perhaps effect a reconciliation"].)

Emphasizing that one is legally entitled to support from one's spouse (see, e.g., Fam. Code, §§ 4300, 4301), the dissenting justice found that, at the time of a spouse's death, the surviving spouse would have "every expectation of the pecuniarily measurable support embodied in the wrongful death award predicated on [the late spouse's] earnings." In concluding that evidence of a decedent's mere intent to divorce is too speculative to affect a surviving spouse's wrongful death recovery for the loss of such earnings, he urged adoption of the following restriction regarding such evidence: "[U]nless legally cognizable, concrete steps are taken—either actual separation or filing for separation or dissolution—the existing legal rights and expectations between spouses remain intact, including expectations of continued support. California's family law takes no account of a mere unacted-upon intention to separate or divorce. Even taking the step of seeing a lawyer does nothing to alter legal rights already in place."

For purposes of this case, we need not decide whether evidence of these identified "legally cognizable, concrete steps" is either necessary or sufficient to establish that a marriage would not have lasted had the decedent lived.[10] Here, the trial court found that Corder's marriage was "on the verge of ending" and "would have lasted a relatively short period of time" had Corder lived, based solely on testimony from Daughter's witnesses claiming that Corder said he felt his marriage was a mistake and he intended to divorce Wife. As we shall explain, that testimony was insufficient to sustain these findings.

*Benwell, supra,* 249 Cal.App.2d 345, is instructive on this point. Similar to the situation here, *Benwell* involved a wrongful death action in which a

---

[10] As indicated, it is undisputed that Corder had not taken any of these specific steps before his death.

husband, shortly before his death, allegedly told a witness that he was getting ready to leave his wife (the plaintiff) and that he could not stand her behavior. (*Id.* at p. 348.) Yet the record disclosed that the husband "did not leave plaintiff and that at the time of his death they were living together." (*Id.* at p. 354.) As pertinent here, *Benwell* concluded the decedent's statements to the witness regarding his attitude and feelings toward the plaintiff were relevant to and admissible on the issue of the plaintiff's loss of comfort and society, "since such conversations were indicative of [the] deceased's feelings and attitude at the time they were uttered." (*Id.* at p. 353.) Nonetheless, *Benwell* noted such evidence could not be used "to prove that [the] deceased was going to leave plaintiff as a matter of fact or to prove any acts of misconduct on the part of plaintiff." (*Id.* at p. 350 [relying in part on Evid. Code, § 1250, subd. (b)].)

Ultimately, *Benwell* determined the trial court did not err in excluding the evidence of the decedent's alleged statements, because their "true evidentiary bearing" was "at best slight and remote, yet of a nature as to make them very prejudicial against plaintiff." (*Benwell, supra,* 249 Cal.App.2d at p. 354.) That is, given the absence of any other evidence in the record showing the decedent contemplated leaving plaintiff, "[t]he jury could draw inferences, which would be no more than conjecture or speculation, that decedent, had he lived, would have left plaintiff and that her behavior was less than exemplary." (*Ibid.*)[11]

Daughter does not address *Benwell*'s conclusions on these points. Instead, she relies on *Foss v. Anthony Industries* (1983) 139 Cal.App.3d 794 [189 Cal.Rptr. 31] (*Foss*), which held a trial court committed reversible error in excluding evidence of a decedent's oral expression of intent on the issue of financial support damages in a wrongful death action. (*Id.* at pp. 800–801.) In *Foss*, the plaintiff sought to introduce testimony of a witness who said the decedent told him he intended to take a job after retiring from the Navy. *Foss* found this evidence relevant because it might have supported a significantly higher amount of financial support damages for the decedent's children than what the jury had awarded. (*Id.* at p. 801.) Although the proffered witness testimony was hearsay, *Foss* held the decedent's statement of his intent to continue working should have been admitted under Evidence Code section 1250, which provides an exception to the hearsay rule for statements of intent. (*Foss, supra,* 139 Cal.App.3d at pp. 800–801.)

We do not read *Benwell, supra,* 249 Cal.App.2d 345, and *Foss, supra,* 139 Cal.App.3d 794, as presenting a conflict of authority. In *Benwell,* the court

---

[11] *Benwell* also held that evidence of the remarriage of the surviving spouse does not affect the damages recoverable in a wrongful death action. (*Benwell, supra,* 249 Cal.App.2d at pp. 355–356.) We agree with Daughter that this aspect of the *Benwell* opinion is not implicated here.

was unimpressed by the evidentiary bearing of the decedent's alleged statement because the record disclosed the decedent was living with his wife and had not left her at the time of his death; nor was there any other evidence that he contemplated leaving her. (*Benwell*, *supra*, 249 Cal.App.2d at p. 354.) Meanwhile, the court in *Foss* determined the evidence of the decedent's intent was relevant on the question of damages in light of "testimony of an expert witness who said the deceased's children would have received over $100,000 more support from the deceased if he had *taken the new job* rather than completely retiring at the end of his naval career." (*Foss*, *supra*, 139 Cal.App.3d at p. 800, italics added; see also *ibid.* ["the witness would have testified the deceased told him he intended to *take the job* following his retirement from the Navy" (italics added)].) This quoted passage indicates there was other evidence in the record of an identified job prospect that the decedent had been offered, but had not yet accepted, before his untimely death.

 Consistent with both *Benwell*, *supra*, 249 Cal.App.2d 345, and *Foss*, *supra*, 139 Cal.App.3d 794, we conclude that the statements of Daughter's witnesses, by themselves, do not support the trial court's factual finding that Corder's marriage would not have lasted for more than a short period of time had he lived. Although declarations of marital unhappiness and a desire to dissolve a marriage may be considered in corroboration of other evidence offered to prove a marriage is on the verge of ending, such declarations, standing alone, are insufficient to support a finding to that effect.[12] In this regard, we are mindful that *Powers*, *supra*, 190 Cal. 487, stands as a compelling illustration of the principle that, in assessing wrongful death damages, a surviving spouse has a legally enforceable right of support that is not easily defeated or diminished by evidence that the marital relationship was strained or disaffected. (See *id.* at pp. 489–490.)

In the proceeding below, the Court of Appeal emphasized that the trial court "found as a factual matter that the marriage was on the verge of ending." Given this factual finding, the Court of Appeal explained, "substantial evidence supports the allocation" of 90 percent of the settlement proceeds to Daughter and 10 percent to Wife. Along the same lines, the court concluded that "if, as found by the trial court," Corder's eight-month marriage was "about to end," that finding supported the amount of Wife's allocated share because it was "significantly more than she was likely to receive" with respect to her legal right of support had Corder not died. In

---

[12] These conclusions in no way alter the existing law that mere declarations of a decedent regarding his or her unhappiness in a marriage may suffice to negate or minimize the surviving spouse's recovery for loss of the decedent's society, comfort, and protection. (See *Benwell*, *supra*, 249 Cal.App.3d at p. 353.)

light of our determination that substantial evidence did not support the trial court's findings, we reverse the judgment of the Court of Appeal with respect to the allocation issue.

## DISPOSITION

The judgment of the Court of Appeal is reversed, and the matter remanded to that court for further proceedings consistent with the views expressed herein.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Respondent's petition for a rehearing was denied September 19, 2007.