Filed 7/9/13

<u>CERTIFIED FOR PARTIAL PUBLICATION</u>[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| DYLAN BOEKEN,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>PHILIP MORRIS USA INC.,<br><br>    Defendant and Appellant. | B236875<br><br>(Los Angeles County<br>Super. Ct. No. BC353365) |

APPEAL from a judgment and order of the Superior Court of Los Angeles County, David L. Minning, Judge.  Affirmed.

Munger, Tolles & Olson, Daniel P. Collins, Bram Alden; Shook, Hardy & Bacon and Patrick J. Gregory for Defendant and Appellant.

Law Offices of Michael J. Piuze, Michael J. Piuze, Geraldine Weiss; Esner, Chang & Boyer, Stuart B. Esner and Andrew N. Chang for Plaintiff and Appellant.

---

[*]     Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of **DISCUSSION, parts II and III.**

## INTRODUCTION

Richard Boeken (Richard)[1] brought an action against Philip Morris USA Inc. (Philip Morris) seeking damages for lung cancer he developed from smoking Philip Morris cigarettes and was awarded compensatory and punitive damages. He died while the verdict was on appeal. (*Boeken v. Philip Morris Inc.* (2005) 127 Cal.App.4th 1640 (Richard's action).) In this case, Dylan Boeken (Dylan), Richard's son, brought a wrongful death action against Philip Morris for Richard's death and recovered $12.8 million for loss of consortium.

On appeal, in the published portion of this opinion, we discuss and reject Philip Morris's contentions that the trial court failed to instruct the jury on the proper measure of Dylan's damages. Relying on *Blackwell v. American Film Co.* (1922) 189 Cal. 689 (*Blackwell*), Philip Morris contends that when a personal injury plaintiff who was fully compensated in a lawsuit for his injuries and resulting physical incapacity dies from those injuries, a surviving child's wrongful death loss of consortium damages are measured from the decedent's post-injury diminished condition at the time of death. Also in the published portion of this opinion, as to Dylan's cross-appeal, we hold he may not recover interest on his award because his Code of Civil Procedure section 998 (section 998) offer of settlement did not include the statutorily required "provision that allows the accepting party to indicate acceptance of the offer by signing a statement that the offer is accepted."

In the unpublished portion of this opinion, we deal with Philip Morris's contentions concerning another jury instruction and the application of collateral estoppel. We affirm the judgment and order.

## FACTUAL AND PROCEDURAL BACKGROUND

In Richard's action, the "jury found that Philip Morris products consumed by [Richard] were defective either in design or by failure to warn prior to 1969, resulting in

---

[1]    We use first names to distinguish between and among members of the Boeken family.

injuries to [Richard].  The jury also found liability to [Richard] based upon fraud by intentional misrepresentation, fraudulent concealment, false promise, and negligent misrepresentation, concluding that [Richard] had justifiably relied upon fraudulent utterances and concealment by Philip Morris." (*Boeken v. Philip Morris, Inc., supra,* 127 Cal.App.4th at pp. 1649-1650.)  The jury awarded Richard compensatory damages of over $5.5 million and punitive damages in an amount that ultimately was reduced on appeal to $50 million.  (*Ibid*.)  Richard died while that verdict was on appeal.  (*Id*. at p. 1649, fn. 1.)

Richard's widow, Judy Boeken, acting for herself and Dylan, filed an action against Philip Morris seeking wrongful death damages.  Her wrongful death claim was dismissed on the ground it was barred by the res judicata effect of a voluntary dismissal with prejudice of her prior action.  (*Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788.)

In his second amended complaint for wrongful death, Dylan alleged that Richard died on January 16, 2002, from injuries caused by Philip Morris products.  Dylan had claims for negligence, strict liability (prior to July 1, 1969), and fraudulent concealment.  Dylan asserted that "offensive collateral estoppel applies to the issues of liability and causation of the injury which subsequently caused" Richard's death and sought damages for loss of consortium and funeral and burial expenses.  Dylan later limited his claims based on Philip Morris' fraudulent concealment to the period prior to July 1, 1969.  Prior to trial, Dylan served on Philip Morris an offer to allow judgment under section 998 in the amount of $4.95 million, which offer Philip Morris did not accept.

Prior to trial, Philip Morris moved for an order that offensive collateral estoppel did not apply to preclude it from relitigating its liability.  The trial court denied the motion.  The trial court also denied Philip Morris's requests to instruct the jury that Dylan's damages were to be measured by Richard's condition as it existed at the time of Richard's death and to modify an instruction on wrongful death damages to state explicitly that Dylan could not recover for any emotional injuries.

3

At trial, Dylan called a number of witnesses who testified that Richard was a good father who had a close relationship with Dylan throughout Dylan's childhood and up to the time of Richard's death. Philip Morris did not call any witnesses who challenged the nature of Dylan's relationship with his father, and does not raise on appeal the admissibility or substance of the testimony of Dylan's witnesses on that subject.

At the close of Dylan's case, Philip Morris moved for a directed verdict, arguing that Dylan had not shown compensable damages by measuring the damages from the condition of Richard at the time of his death. The trial court denied the motion. The jury returned a verdict for Dylan, awarding him $12.8 million in damages. Philip Morris moved for a judgment notwithstanding the verdict, arguing that Dylan failed to show damages under the proper measure of damages. It also moved for a new trial, in part, on the grounds that the trial court erred in instructing the jury on the measure of Dylan's damages and in applying offensive collateral estoppel to the issue of its liability. The trial court denied Philip Morris's motions.

Dylan moved for an award of prejudgment interest pursuant to Civil Code section 3291 (section 3291) on the ground that the jury's verdict exceeded his section 998 offer. The trial court, in denying the motion, ruled that Dylan's section 998 offer was invalid because it did not contain the required acceptance provision that allowed Philip Morris to indicate that it accepted the offer by signing a statement in the offer that it was accepted.

Philip Morris appeals from the judgment. Dylan cross appeals from the trial court's order denying prejudgment interest.

## DISCUSSION

### I. Dylan's Damages

Philip Morris contends that when, as here, a personal injury plaintiff (Richard) who brought an action in which he was fully compensated for his injuries and resulting physical incapacity dies from those injuries, his child's (Dylan's) damages in a subsequent wrongful death action—here, loss of consortium damages—are based on the

4

decedent's post-injury diminished condition at the time of death.  Philip Morris argues that the application of such a rule would, in effect, prohibit any recovery to Dylan—presumably on the theory that Richard, due to his lung cancer, was unable to provide Dylan any comfort, society, or protection at the time of Richard's death.

"Unlike some jurisdictions wherein wrongful death actions are derivative, Code of Civil Procedure section 377.60 'creates a *new cause of action* in favor of the heirs as beneficiaries, based upon their own independent pecuniary injury suffered by loss of a relative, and distinct from any the deceased might have maintained had he survived. [Citations.]'  [Citations.]" (*Horwich v. Superior Court* (1999) 21 Cal.4th 272, 283.) Under Code of Civil Procedure section 377.61, damages for wrongful death "are measured by the financial benefits the heirs were receiving at the time of death, those reasonably to be expected in the future, and the monetary equivalent of loss of comfort, society, and protection.  (*Corder v. Corder* (2007) 41 Cal.4th 644, 661 [61 Cal.Rptr.3d 660, 161 P.3d 172] (*Corder*).)"  (*Mendoza v. City of West Covina* (2012) 206 Cal.App.4th 702, 720 (*Mendoza*).)

In *Boeken v. Philip Morris USA, Inc., supra,* 48 Cal.4th at pages 795 through 796, our Supreme Court explained:  "Originally, the recovery in wrongful death actions was limited to 'pecuniary injury' (Stats. 1862, ch. 330, § 3, p. 448), which some courts interpreted to mean that only economic losses were compensable (such as loss of financial support or household services).  As early as 1911, however, we recognized the right of wrongful death plaintiffs to recover *noneconomic* damages, including damages for loss of society and comfort, so long as the damages were not based merely on grief or sorrow.  (See *Bond v. United Railroads of San Francisco* (1911) 159 Cal. 270, 285-286, 113 P. 366.)  In *Krouse v. Graham* (1977) 19 Cal.3d 59, 67-70 [137 Cal.Rptr. 863, 562 P.2d 1022], we confirmed that loss of consortium damages are recoverable in wrongful

death actions." California permits recovery in a child's wrongful death action for loss of a parent's consortium. (*Borer v. American Airlines, Inc.* (1977) 19 Cal.3d 441, 451.)[2]

Philip Morris contends that the Supreme Court in *Blackwell, supra,* 189 Cal. 689 established what the proper measure of Dylan's damages should have been—i.e., damages based on a Richard's post-injury diminished condition at the time of Richard's death. In *Blackwell,* Edward Blackwell's leg was injured in an automobile accident. (*Id.* at p. 692.) He brought an action for his injuries and recovered $13,762. (*Id.* at p. 693.) While the judgment was on appeal, Mr. Blackwell died from shock following an operation on his leg. (*Id.* at pp. 692-693.) The judgment, which was affirmed, was paid to Mr. Blackwell's wife, Rachel Blackwell, as administratrix of his estate. (*Id.* at p. 613.)

Mrs. Blackwell then brought a wrongful death action and recovered $10,000. (*Blackwell, supra,* 189 Cal. at pp. 692-693.) On appeal, the defendant argued that the trial court erred in refusing to give two instructions to the effect that the jury, in estimating damages, "could consider the physical condition of [the] decedent immediately prior to his last operation, in determining the probable amount of *financial assistance* he would have rendered to his widow and children." (*Id.* at p. 702, italics added.) The court rejected the defendant's argument because the jury had been instructed at defendant's request with an instruction that was substantially similar to the two refused instructions.[3] (*Ibid.*) Mrs. Blackwell disputed the soundness of the instruction given, as well as the two rejected instructions. (*Ibid.*) The court said, "The question in this case was what pecuniary loss was suffered by respondent and her children by reason of the loss of decedent in his crippled condition." (*Id.* at p. 697.) The court added, "[A]s already pointed out, decedent was fully compensated for the injuries sustained by him and for his resulting physical incapacity and in estimating the pecuniary loss resulting to

---

[2]    As to other jurisdictions, see generally, Williams, *Cause of Action by Child for Loss of Parent's Consortium* (2013) 12 Causes of Action 2d. 419.

[3]    We deny Philip Morris's request to take judicial notice of excerpts from the record in *Blackwell, supra,* 189 Cal. 689 reflecting the text of the instructions at issue.

[Mrs. Blackwell] by virtue of his death it was necessary to take into consideration his crippled condition." (*Id.* at p. 702.)

Philip Morris concludes from *Blackwell, supra,* 189 Cal. 689, that "where the defendant has *already* been required to fully compensate the decedent for the harm of reducing him from his pre-injury healthy condition to his pre-death diminished condition, his heirs cannot collect a second time for that reduction in the decedent's condition in a wrongful death case." Thus, according to Philip Morris, loss of consortium damages are to be determined by considering only the decedent's post-injury physical condition at the time of his death.

At trial, Philip Morris requested two instructions consistent with its view of the proper measure of damages based on its interpretation of the holding in *Blackwell, supra,* 189 Cal. 689. Those instructions would have required the jury to determine Dylan's damages based on the "conditions existing at the time of death" and to consider "[t]he health of the deceased . . . immediately before death." The trial court denied the requests.[4] The trial court also denied Philip Morris's motions for a directed verdict, for a judgment notwithstanding the verdict and for a new trial on the asserted ground that Dylan had failed to show damages under what Philip Morris argued was the proper measure of damages.

Philip Morris overstates the relevant holding in *Blackwell, supra,* 189 Cal. 689. Reasonably read, the holding by the court in *Blackwell* applies to lost economic support and not to lost consortium. The instructions at issue in *Blackwell* concerned damages for the "*financial assistance* [Mr. Blackwell] would have rendered to his widow and children" (*id.* at p. 702, italics added)—i.e., the pecuniary loss of economic support—and not to the pecuniary value of the "loss of [his] comfort, society, protection, nurture and education." (*Id.* at p. 701).

---

[4]    The trial court also rejected Philip Morris's request to modify CACI No. 3921 to instruct the jury that it could consider Richard's health immediately before his death in calculating his life expectancy.

In describing Mr. Blackwell's recovery in his personal injury action, the court in *Blackwell, supra,* 189 Cal. 689 stated, "The verdict and judgment in that action established the fact that he was damaged to the extent fixed by the verdict, and this represents his decreased earning capacity, injuries, pain and suffering." (*Id.* at pp. 696-697.) Thus, the court reasoned, the question in Mrs. Blackwell's subsequent wrongful death "case was what pecuniary loss was suffered by [her] and her children by reason of the loss of decedent in his crippled condition." (*Id.* at p. 697.) Because Mr. Blackwell had been compensated for his decreased earning capacity in his personal injury action, Mrs. Blackwell could not recover again for those damages in her wrongful death action. That is, in determining Mrs. Blackwell's economic support damages, the jury was to consider Blackwell's decreased earning capacity caused by his "crippled condition." As the court stated in *Fein v. Permanente Medical* Group (1985) 38 Cal.3d 137, "In *Blackwell v. American Film Co*. (1922) 189 Cal. 689, 700-702 [209 P. 999], we held that in a wrongful death case, a jury was properly instructed that in computing damages it should consider the amount the decedent had obtained from defendant in an earlier judgment as compensation for the impairment of his future earning capacity." (*Id.* at pp. 154-155, see also 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 1168, 1187.)

Philip Morris contends that the court in *Blackwell* dealt with "pecuniary loss" that included both loss of consortium as well as "the probable amount of financial assistance." (*Blackwell, supra,* 189 Cal. at 702.) We read the court's discussion of the decedent's "condition . . . immediately prior to his last operation" as concerning only "the probable amount of financial assistance he would have rendered to his widow and children." (*Ibid.*)

To read *Blackwell, supra,* 189 Cal. 689, as does Philip Morris, makes little sense. *Blackwell* dealt with a concern about a double recovery (*id.* at p. 702), which is not an issue in a loss of consortium claim brought by a decedent's child. According to Philip Morris, had Richard lived without lung cancer, but been killed instantly by some other tortious means, Dylan would have been entitled to recover against the tortfeasor; but because Richard died a long, agonizing death caused by Philip Morris, Dylan is entitled

8

to no recovery. Or, as argued by Dylan, under Philip Morris's contention, if two people are hit in a crosswalk by an automobile and one is killed instantly and the other dies in a week from severe injuries, the child of the first accident victim would be entitled to loss of consortium damages but the child of the second accident victim would not. Our 1922 Supreme Court could not have intended such an absurd result. As Justice Cardozo wrote in 1920, "we are not to close our eyes as judges to what we perceive as men." (*People ex rel. Alpha Portland Cement Co. v. Knapp* (1920) 230 N.Y. 48, 63.) Or as another jurist recently observed, "There is enough unavoidable absurdity in life. We should avoid absurdity in the law." (*Zack v. Tucker* (11th Cir. 2013) 704 F.3d 917, 927.)

Accordingly, the trial court in this case did not err in refusing Philip Morris's two proposed jury instructions, and in denying its request to modify CACI No. 3921, its motion for a directed verdict, its motion for a judgment notwithstanding the verdict, and its motion for a new trial, all of which were based on the erroneous ground that Dylan's loss of consortium damages were to be measured from Richard's physical condition at the time of his death.

## II. Emotional Injuries

Philip Morris contends that the trial court erred in denying its request to clarify what it considers an ambiguity in CACI No. 3921—the instruction on wrongful death damages—that allowed the jury to award impermissible damages for emotional injury. The trial court properly instructed the jury.

### A. Standard of Review

"The trial court's 'duty to instruct the jury is discharged if its instructions embrace all points of law necessary to a decision.' [Citation.] 'A party is not entitled to have the jury instructed in any particular fashion or phraseology, and may not complain if the court correctly gives the substance of the applicable law.' [Citation.] [¶] When a party challenges a particular jury instruction as being incorrect or incomplete, 'we evaluate the instructions given as a whole, not in isolation.' [Citation.] "'For ambiguous instructions,

the test is whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction."' [Citation.] The propriety of jury instructions is a question of law that we review de novo. [Citation.]" (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 82.)

### B. Application of Relevant Principles

Our Supreme Court has stated that cases that allow damages for the pecuniary value of lost affection, society, and comfort in wrongful death actions "suggest a realization that if damages truly were limited to 'pecuniary' loss, recovery frequently would be barred by the heirs' inability to prove such loss. The services of children, elderly parents, or nonworking spouses often do not result in measurable net income to the family unit, yet unquestionably the death of such a person represents a substantial 'injury' to the family unit for which just compensation should be paid." (*Krouse v. Graham* (1977) 19 Cal.3d 59, 68.) Among the relevant factors when evaluating the claimed loss of society, comfort, and affection may be the closeness of the family unit, the depth of their love and affection, and the character of the deceased as kind, attentive, and loving. (*Corder, supra,* 41 Cal.4th at p. 662; see *Mendoza, supra,* 206 Cal.App.4th at p. 721.) But "recovery is not available in wrongful death actions for the grief or sorrow attendant upon the death of a loved one. [Citation.]" (*Corder, supra,* 41 Cal.4th at p. 662.) As stated in *Krouse v. Graham, supra,* 19 Cal.3d at page 72, "California cases have uniformly held that damages for mental and emotional distress, including grief and sorrow, are not recoverable in a wrongful death action. [Citations.]" (See *Boeken v. Philip Morris USA, Inc., supra,* 48 Cal.4th at p. 796 [a wrongful death plaintiff may "recover noneconomic damages, including damages for loss of society and comfort, so long as the damages were not based merely on grief or sorrow"].)

As given by the trial court, CACI No. 3921 instructed the jury that Dylan claimed noneconomic damages including the loss of Richard's "love, companionship, comfort, care, assistance, protection, affection, society, [and] moral support." The instruction further told the jury that it could not consider, among other things, Dylan's "grief,

10

sorrow, or mental anguish" in determining his noneconomic damages. With respect to that part of the instruction that told the jury the matters it was not to consider in determining Dylan's noneconomic damages, the trial court denied Philip Morris's request that the trial court modify the instruction to tell the jury that it was not to consider "Plaintiff's emotional injuries, including, but not limited to, grief, sorrow, mental anguish, or sad emotions."

Philip Morris contends that CACI No. 3291 is ambiguous because it can be "misconstrued as barring recovery only for *mourning*, rather than for all emotional injuries that a plaintiff might claim over the loss of many years with the decedent . . . ." Such a misconstruction would not be reasonable or likely. Reasonably construed, CACI No. 3291's directive that a jury is not to consider a plaintiff's "grief, sorrow, and mental anguish" in determining noneconomic damages tells the jury that it is prohibited from considering "all emotional injuries." Because CACI No. 3921's statement that the jury could not consider Dylan's "grief, sorrow, or mental anguish" in determining his noneconomic damages accurately and unambiguously stated the law on recoverable noneconomic damages in a wrongful death action (*Boeken v. Philip Morris USA, Inc., supra,* 48 Cal.4th at p. 796; *Corder, supra,* 41Cal.4th at p. 662; *Krouse v. Graham, supra,* 19 Cal.3d at p. 72), the trial court did not err in denying Philip Morris's requested modification (*Cristler v. Express Messenger Systems, Inc., supra,*171 Cal.App.4th at p. 82).

### III.    Collateral Estoppel

Philip Morris argues that the trial court erred in ruling that the judgment against it in Richard's action collaterally estopped it from relitigating liability[5] in Dylan's wrongful death action. The trial court did not err.

---

[5]     The parties refer to liability and causation. But there can be no liability without causation. (See *Bockrath v. Aldrich Chemical Co, Inc.* (1999) 21 Cal.4th 71, 78-79; *Perlin v. Fountain View Management, Inc.* (2008) 163 Cal.App.4th 657, 660 ["causation is an element of liability"].)

11

*A.*     *Standard of Review*

"Although some cases suggest that a trial court's decision to allow the offensive use of collateral estoppel is an exercise of discretion to which an appellate court should give deference [citation], the 'predominate view' in this state is that 'the trial court's application of collateral estoppel is reviewed de novo.' [Citations.]" (*Smith v. ExxonMobil Oil Corp.* (2007) 153 Cal.App.4th 1407, 1414-1415.)

*B.*     *Application of Relevant Principles*

"Collateral estoppel is an equitable concept based on fundamental principles of fairness." (*Sandoval v. Superior Court* (1983) 140 Cal.App.3d 932, 941.) "Collateral estoppel precludes relitigation of issues argued and decided in prior proceedings. Traditionally, we have applied the doctrine only if several threshold requirements are fulfilled. First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. [Citations.] Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding. [Citations.] The party asserting collateral estoppel bears the burden of establishing these requirements." (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341, fn. omitted.) "[T]he offensive use of collateral estoppel is more closely scrutinized than the defensive use of the doctrine. [Citation.]" (*White Motor Corp. v. Teresinski* (1989) 214 Cal.App.3d 754, 763.)

1.     The Immunity Statute

Philip Morris argues that liability and causation could not be established through collateral estoppel in Dylan's action because, as a result of cases decided after Richard's trial, there was a significant "change" in the law concerning the statutory immunity for tobacco companies conferred by Civil Code section 1714.45 (section 1714.45) (the

Immunity Statute) thereby precluding the application of collateral estoppel.[6]  Thus, according to Philip Morris, liability and causation in Dylan's action were not identical to liability and causation in Richard's action.

As of January 1, 1988, section 1714.45 "granted tobacco companies complete immunity in certain product liability lawsuits." (*Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 831-832 (*Myers*).)  Ten years later, section 1714.45 was amended to repeal that immunity (the Repeal Statute). (*Myers, supra,* 28 Cal.4th at pp. 832, 837.)  In *Myers*, the court held that the Repeal Statute removed the protection the Immunity Statute gave tobacco companies for their "conduct" that occurred before January 1, 1988, but that the Repeal Statute did not apply retroactively to remove that protection for conduct that occurred during the period the Immunity Statute was in effect. (*Id.* at pp. 832, 847-848.)  Thus, the Immunity Statute continues to shield tobacco manufacturers for their conduct during the period it was in effect—i.e. from January 1, 1988, to January 1, 1998—but not for conduct outside that period. (*Id.* at p. 848.)  The court in *Myers* said, "plaintiff has no product liability claim against defendant tobacco companies for their conduct in manufacturing and distributing cigarettes during the statutory immunity period." (*Id.* at p. 847.)

Shortly after *Myers, supra,* 28 Cal.4th 828, in *Naegele v. R.J. Reynolds Tobacco Co.* (2002) 28 Cal.4th 856, 863 (*Naegele*), the court held that "under the Immunity Statute's broad definition of product liability lawsuits, it makes no difference whether a claim seeking damages for 'personal injury or death' caused by a tobacco product is labeled as one for negligence, manufacture of an inherently unsafe product, or fraud." (*Id.* at p. 863.)  The court further held, however, that the Immunity Statute does not apply to all conduct by tobacco companies during the period the immunity was in effect. (*Ibid.*)  The Immunity Statute's protection "does not extend to allegations that tobacco companies, in the manufacture of cigarettes, used additives that exposed smokers to

---

[6]     The jury returned its verdict in Richard's action on June 5, 2001.  The amended judgment was entered on September 5, 2001. (*Boeken v. Philip Morris Inc., supra,* 127 Cal.App.4th at p. 1650.)

dangers beyond those commonly known to be associated with cigarette smoking." (*Id.* at pp. 861, 863, 865.) Then, in *Whiteley v. Phillip Morris, Inc.* (2004) 117 Cal.App.4th 635 (*Whiteley*), the court held that the trial court prejudicially erred in refusing to instruct the jury that it could not base liability on conduct occurring during the 10-year period the Immunity Statute was in effect. (*Id.* at pp. 641-642, 654-665.)[7]

Philip Morris contends that after *Myers, supra,* 28 Cal.4th 828, *Naegele, supra,* 28 Cal.4th 856, and *Whiteley, supra,* 117 Cal.App.4th 635, Dylan had to prove that Richard developed lung cancer based on conduct that occurred outside the immunity period. Philip Morris maintains it was entitled to argue to the jury that immunity-period smoking could not be considered in determining liability, and especially causation. Philip Morris also argues that although the jury, absent the application of collateral estoppel, in Dylan's action would have been required to follow the legal standards announced in *Myers*, *Naegele*, and *Whiteley*; the jury verdict in Richard's action, which preceded those cases, did not follow those not yet articulated standards. Accordingly, Philip Morris concludes, the identity of law requirement for collateral estoppel was not satisfied.

Philip Morris's argument fails. The jury in Richard's action found, in part, that prior to July 1, 1969 Philip Morris caused and was liable for Richard's injuries—i.e., his lung cancer—based on Philip Morris's fraudulent concealment of material facts about its products. That conduct by Philip Morris occurred**,** and Richard's claim arose, prior to enactment of the Immunity Statue and outside of the immunity period. As Richard, Dylan has asserted and limited his claim for fraudulent concealment of material facts to the period prior to July 1, 1969.

As pleaded in the second amended complaint, Dylan alleged that Philip Morris's fraudulent concealment began in the 1950's and continued until at least 2000. Dylan later limited his claim to the period prior to July 1, 1969. Because the jury in Richard's action found liability, including causation, preceding the 10-year period that the

---

[7] The court in *Whiteley* also excluded adulteration from the application of the immunity statute.

Immunity Statute was in effect, and Dylan alleged the same basis for liability, by limiting his claim to the period prior to July 1, 1969, any change in the law concerning the application of the Immunity Statute brought by *Myers, supra,* 28 Cal.4th 828, *Naegele, supra,* 28 Cal.4th 856, and *Whiteley, supra,* 117 Cal.App.4th 635 did not represent a change in the law relevant to liability and causation to preclude the application of offensive collateral estoppel. (See *Myers, supra,* 28 Cal.4th at p. 848.)

Philip Morris, in a related argument, contends that the jury's finding of liability, including causation, based on Philip Morris's pre-July 1, 1969, conduct may not be used for collateral estoppel purposes in Dylan's action because Richard never argued in his action that his lung cancer was caused solely by smoking outside the immunity period and the jury was never asked to make such a determination. Thus, according to Philip Morris, "the Immunity Statute does not permit Dylan to claim that pre-1969 concealment of the dangers of smoking led Richard to smoke cigarettes for decades (*including* during the immunity period), in turn causing his lung cancer." But Dylan limited his "claim" to the period prior "to July 1, 1969." Richard successfully asserted that his claim arose prior to that date. (See *Vanhooser v. Superior Court* (2012) 206 Cal.App.4th 921, 929 ["accrual of a cause of action in the sense of creation of an actionable claim is not the same as accrual for purposes of the statute of limitations"].) In addition, the appropriate focus in determining whether the Immunity Statute applies to Dylan's pre-July 1, 1969, fraudulent concealment claim is not on Richard's *conduct* during the immunity period, but on Philip Morris's conduct outside that period. (See *Myers, supra,* 28 Cal.4th at p. 848 ["[T]he Immunity Statute continues to shield defendant tobacco companies in product liability actions but only for conduct they engaged in *during* the 10-year period when the Immunity Statute was in effect. The liability of tobacco companies based on their conduct *outside* the 10-year period of immunity is governed by general tort principles"]; cf. *Buttram v. Owens-Corning Fiberglas Corp.* (1997) 16 Cal.4th 520, 529 ["'insidious disease litigation involves an extended chronology of causation unlike traditional snapshot torts.' [Citation.]".)

15

Philip Morris also contends that Dylan cannot show that Richard's pre-July 1, 1969, claim was *necessary* to the final judgment in Richard's action, a prerequisite to giving it collateral estoppel effect, because the "jury's award was based on a unitary consideration of *all* of the six alternative theories." However, "'[w]here the judgment is based upon the matters litigated as alternative grounds, the judgment is determinative on both grounds, although either alone would have been sufficient to support the judgment.'" (*Wall v. Donovan* (1980) 113 Cal.App.3d 122, 126.) "'If the questions involved in a suit are tried and decided, no matter how numerous they may be, the estoppel of the judgment will apply to each point so settled, in the same degree as if it were the sole issue in the case.'" (*Bank of America v. McLaughlin Etc. Co.* (1940) 40 Cal.App.2d 620, 628; see *Butcher v. Truck Ins. Exchange* (2000) 77 Cal.App.4th 1442, 1458; 7 Witkin Cal. Proc. (5th ed. 2008) Judgment, § 415, pp. 1056-1059.) The rationale behind these rules "is that if a party has an opportunity and motivation to fully litigate an issue, then he can anticipate the potential barring effect of an adverse judgment." (*Wall v. Donovan, supra,* 113 Cal.App.3d at p. 126.)

### 2. Comparative Fault

Collateral estoppel did not apply in Dylan's action, Philip Morris argues, because its liability to Dylan for wrongful death was subject to a comparative fault defense and that defense was not litigated or decided in Richard's action. Philip Morris's argument fails because the jury in Richard's action found Philip Morris liable for intentional torts, Dylan alleged one of the same intentional torts in his action, and comparative fault does not apply to intentional torts. (*Smith v. Williams* (1961) 55 Cal.2d 617, 620 [negligence in failing to discover the falsity of a statement is not a defense to an alleged intentional misrepresentation]; *Heiner v. Kmart Corp.* (2000) 84 Cal.App.4th 335, 349 [comparative fault is not a defense to the intentional tort of battery]; *Allen v. Sundean* (1982) 137 Cal.App.3d 216, 226 [*Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804 and *American Motorcycle Assn. v. Superior Court* (1978) 20 Cal.3d 578 "used language which appears to exclude intentional torts from the comparative fault system"]; 5 Witkin, Summary of

16

Cal. Law, *supra,* Torts, § 813, p. 1174 ["the former defense of contributory negligence of the plaintiff was held not to be a defense to the intentional tort of fraud. [Citations.]"].)

        3.     Fairness

Application of collateral estoppel to establish liability and causation was unfair, Philip Morris contends, because there was a material change in the law on the Immunity Statute after the trial in Richard's action and the judgment in Richard's action was inconsistent with previous judgments in Philip Morris's favor and was indicative of passion and prejudice. We disagree.

Collateral estoppel is an equitable doctrine that is based on fundamental principles of fairness. (*Direct Shopping Network, LLC v. James* (2012) 206 Cal.App.4th 1551, 1562; *Sandoval v. Superior Court, supra,* 140 Cal.App.3d at p. 941.) Thus, even when the threshold requirements are met, collateral estoppel is applied """"only where such application comports with fairness and sound public policy."'" [Citation.]" (*Direct Shopping Network, LLC v. James, supra,* 206 Cal.App.4th at p. 1562.)

The court in *Roos v. Red* (2005) 130 Cal.App.4th 870, 880, footnote omitted, discussed the fairness aspect of collateral estoppel as follows: "[W]here collateral estoppel is applied 'offensively' to preclude a defendant from relitigating an issue the defendant previously litigated and lost, the courts consider whether the party against whom the earlier decision is asserted had a 'full and fair' opportunity to litigate the issue. [Citations.] [¶] To that end, the courts have recognized that certain circumstances exist that so undermine the confidence in the validity of the prior proceeding that the application of collateral estoppel would be 'unfair' to the defendant as a matter of law. (*Kremer v. Chemical Construction Corporation* [(1982)] 456 U.S. [461,] 481 ['Redetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in the prior litigation'].) Such 'unfair' circumstances include a situation where the defendant had no incentive to vigorously litigate the issue in the prior action, 'particularly if the second action is not foreseeable.' [Citations.] Another such circumstance occurs when the judgment in the prior action is

17

inconsistent with previous judgments for the defendant on the matter.  [Citation.]  Finally, application of collateral estoppel is unfair where the second action 'affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result.'"

Philip Morris contends that application of collateral estoppel is unfair due to the material change in law after the trial in Richard's action concerning the Immunity Statute brought by the decisions in *Myers, supra,* 28 Cal.4th 828, *Naegele, supra,* 28 Cal.4th 856, and *Whiteley, supra,* 117 Cal.App.4th 635.  Because, as we held above, any change in the law on the Immunity Statute did not preclude application of collateral estoppel due to the jury's finding of liability and causation in Richard's action based on Philip Morris's pre-July 1, 1969, conduct, it was not unfair to apply collateral estoppel even if there were subsequent cases on the subject.

Philip Morris next contends that it was unfair to establish liability and causation through collateral estoppel in light of previous verdicts in its favor in actions that included claims of fraud by intentional misrepresentation, by concealment, by false promise, or by negligent misrepresentation.  There was no unfairness.  In Richard's personal injury action, the jury found that Philip Morris's conduct caused, and Philip Morris was liable for, Richard's injuries—i.e., the lung cancer from which Richard ultimately died.  In Dylan's wrongful death action, collateral estoppel was used to establish Philip Morris's responsibility for the very same conduct and the very same result—causing the lung cancer from which Richard died.  Philip Morris had every incentive to contest vigorously liability and causation in Richard's action—particularly in light of the near certainty that a wrongful death action would follow—and a full and fair opportunity in that action to litigate those issues.  In light of the circumstances of this case, the other verdicts Philip Morris cites have no bearing on fairness in this case.

Finally, Philip Morris relies on the jury's $3 billion punitive damages award in Richard's action to argue that the jury's verdict in that action was the product of passion and prejudice and thus not worthy of collateral estoppel effect.  Although the jury's award was twice found to be excessive and twice reduced—from $3 billion to $100

18

million by the trial court, and from $100 million to $50 million by the Court of Appeal—substantial punitive damages ultimately were assessed against Philip Morris for its wrongful conduct, and the jury's findings on liability were affirmed on appeal. (*Boeken v. Philip Morris Inc., supra,* 127 Cal.App.4th at pp. 1650, 1703-1704.) The ultimate assessment of substantial punitive damages against Philip Morris dispels any notion that there was sufficient passion or prejudice for determining a lack of "fairness" in the application of collateral estoppel. Accordingly, the jury's punitive damages award that was reduced was not a basis for precluding application of collateral estoppel.

## IV. Prejudgment Interest

According to Dylan, the trial court erred when it denied his motion for prejudgment interest under section 3291[8] on the ground that his section 998[9] offer to allow judgment failed to include a provision allowing Philip Morris to accept the offer by signing a statement that the offer was accepted. Dylan asserts that we should interpret section 998's language that such an "acceptance provision" "shall" be included in a

---

[8] Section 3291 provides in pertinent part, "If the plaintiff makes an offer pursuant to Section 998 of the Code of Civil Procedure which the defendant does not accept prior to trial or within 30 days, whichever occurs first, and the plaintiff obtains a more favorable judgment, the judgment shall bear interest at the legal rate of 10 percent per annum calculated from the date of the plaintiff's first offer pursuant to Section 998 of the Code of Civil Procedure which is exceeded by the judgment, and interest shall accrue until the satisfaction of judgment."

[9] Section 998, subdivision (b) provides in relevant part, "Not less than 10 days prior to commencement of trial or arbitration (as provided in Section 1281 or 1295) of a dispute to be resolved by arbitration, any party may serve an offer in writing upon any other party to the action to allow judgment to be taken or an award to be entered in accordance with the terms and conditions stated at that time. The written offer shall include a statement of the offer, containing the terms and conditions of the judgment or award, and a provision that allows the accepting party to indicate acceptance of the offer by signing a statement that the offer is accepted. Any acceptance of the offer, whether made on the document containing the offer or on a separate document of acceptance, shall be in writing and shall be signed by counsel for the accepting party or, if not represented by counsel, by the accepting party."

19

section 998 offer as "directive" and not "mandatory." The trial court did not err because the acceptance provision was mandatory and Dylan's section 998 offer therefore was invalid.[10]

### A. Standard of Review

We review de novo issues of statutory construction. (*Barner v. Leeds* (2000) 24 Cal.4th 676, 683.)

### B. Application of Relevant Principles

Prior to trial, Dylan served a section 998 offer to allow judgment against Philip Morris in the amount of $4.95 million. Philip Morris did not accept the offer. Following a jury trial, Dylan was awarded $12.8 million. Thereafter, because the verdict exceeded his section 998 offer, Dylan moved for an award of prejudgment interest pursuant to section 3291. The trial court denied the motion, ruling that Dylan's section 998 offer was invalid because it did not contain a provision that if Philip Morris was to accept the offer, it would do so by signing a statement that the offer was accepted.

Under section 998, either party to an action may serve a written offer to allow judgment on the opposing party. (§ 998, subd. (b).) If a plaintiff makes an offer under section 998 that the defendant does not accept and the plaintiff receives a more favorable judgment, the judgment accrues interest at the annual rate of 10 percent from the date of the plaintiff's offer. (§ 3291.) Effective January 1, 2006, the Legislature amended subdivision (b) of section 998 in part to add the requirement that offers under section 998 "*shall* include a statement of the offer, containing the terms and conditions of the judgment or award, and a provision that allows the accepting party to indicate acceptance of the offer by signing a statement that the offer is accepted." (Stats.2005, ch. 706, § 13, italics added.)

---

[10] Because we hold that Dylan's section 998 offer was invalid, we do not need to reach Philip Morris's argument that Dylan was not entitled to prejudgment interest because section 3291 does not apply to wrongful death actions.

In *Puerta v. Torres* (2011) 195 Cal.App.4th 1267, the defendant served a section 998 offer on the plaintiff. The offer did not include the required acceptance provision. The Court of Appeal held that under the plain language of the statute, a section 998 offer must include an acceptance provision, and the defendant's offer was invalid for lack of such a provision. (*Id.* at pp. 1270, 1273.) In reaching this conclusion, the court considered two "competing dynamics." (*Id.* at p. 1272.) The first "dynamic" was case law predating the acceptance provision amendment to section 998 that emphasized that the purpose of section 998 was to encourage settlement. (*Puerta v. Torres, supra,* 195 Cal.App.4th at p. 1272.) Those cases held that offers under section 998 should be held valid if they are clear and understandable, "even if they do not precisely track the statute's language." (*Puerta v. Torres, supra,* 195 Cal.App.4th at p. 1272.) The second "dynamic" was the "most fundamental principles of statutory construction." (*Ibid.*) Under those principles, if the language of a statute "'is clear and unambiguous, the plain meaning governs.' (*Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 444 [79 Cal.Rptr.3d 312, 187 P.3d 37]; see *Young v. Gannon* (2002) 97 Cal.App.4th 209, 223 [118 Cal.Rptr.2d 187] [the 'court looks first to the language of the statute; if clear and unambiguous, the court will give effect to its plain meaning'].)" (*Ibid.*) The court found this second "dynamic" to predominate. (*Ibid.*) It stated that section 998, subdivision (b) provides that offers to compromise "shall" include an acceptance provision and cited *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 443 for the proposition that "[i]t is a well-settled principle of statutory construction that the word . . . 'shall' is ordinarily construed as mandatory . . . ." (*Puerta v. Torres, supra,* 195 Cal.App.4th at p. 1272.)

The defendant in *Puerta v. Torres, supra,* 195 Cal.App.4th at pages 1272 through 1273 argued, as does Dylan, that "shall" is not always construed as strictly mandatory, such as when that construction would defeat the purpose of the statute. The court held, however, that applying the acceptance provision amendment to section 998 as written did not defeat the statute's purpose. (*Puerta v. Torres, supra,* 195 Cal.App.4th at p. 1273.) The amendment required that an acceptance of a section 998 offer be in writing and that

21

the manner of acceptance be indicated in the offer. (*Puerta v. Torres, supra,* 195 Cal.App.4th at p. 1273.) The court reasoned, "The statute's new language seeks to eliminate uncertainty by removing the possibility that an oral acceptance might be valid, which is a legitimate concern. While there is room for interpretation as to how an appropriate statement regarding acceptance might be phrased in the offer, it is clear from the statute's language that at least *some* indication of how to accept is required by the amendment." (*Ibid;* accord, *Perez v. Torres* (2012) 206 Cal.App.4th 418.)

We agree with the court's analysis in *Puerta v. Torres*, *supra,* 195 Cal.App.4th 1267. Construing the acceptance provision amendment as directory and not mandatory would defeat the purpose of the amendment—eliminating uncertainty in the acceptance of section 998 offers by requiring the acceptance to be made by a signed statement. Requiring the offeror to include in the section 998 offer, in essence, the manner in which the offer must be accepted, arguably facilitates settlements by deterring invalid, oral acceptances.

Dylan argues that the validity of a section 998 offer that does not include an acceptance provision should be determined by evaluating the litigation sophistication of the party receiving the offer—that is, whether the party receiving the offer was "actually confused" about how to accept a section 998 offer. Dylan reasons, "If an extremely sophisticated litigant represented by extremely qualified counsel knows full well how to accept a section 998 offer, but declines to do so in order to force a trial, the purpose of section 998 is subverted by invalidating the offer to settle on a technicality." The court in *Perez v. Torres, supra,* 206 Cal.App.4th 418 essentially rejected this argument by holding that an acceptance provision in a section 998 offer is mandatory whether or not the party receiving the offer represents himself or is represented by counsel. (*Id.* at pp. 423-424.) Any attorney who reviews section 998 might well advise the client to ignore a section 998 offer that does not include the required acceptance language.

Dylan points to his counsel's declaration that Philip Morris never settles these types of personal injury actions.[11]  But this is of no avail to Dylan, for we interpret the mandatory requirements of the statute without regards to what occurred in this particular case or the tactics of a party.

Because Dylan's section 998 offer did not include the required acceptance provision, the offer was invalid.  (*Puerta v. Torres, supra,* 195 Cal.App.4th at p. 1273; *Perez v. Torres, supra,* 206 Cal.App.4th at pp. 423-424.)  Accordingly, the trial court did not err in denying Dylan's motion for interest pursuant to section 3291.

## DISPOSITION

The judgment and order are affirmed.  Plaintiff is awarded costs on appeal.

**CERTIFIED FOR PARTIAL PUBLICATION**


MOSK, J.

We concur:


TURNER, P. J.


KRIEGLER, J.

---

[11]  Counsel's declaration stated, in part, "Philip Morris' failure to express any interest in accepting the offers or indeed to respond to them at all came as no surprise to me.  I have been involved in several of legal actions against Philip Morris since 2000.  Philip Morris never made any offer to settle any of those actions against it.  Attorneys for Philip Morris informed me that there would never be a reason for a settlement conference since Philip Morris would never settle a case filed against it claiming personal injury or wrongful death.  I have heard attorneys for Philip Morris state this to Los Angeles County Superior Court judges.  I have been told by attorneys for Philip Morris that its national litigation strategy is to never offer a dime in settlement."