Filed 9/26/19

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| RACHEL FERNANDEZ et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> ELBA JANETH JIMENEZ et al., <br><br> Defendants and Appellants. | B281518 <br><br> (Los Angeles County <br> Super. Ct. No. BC511347) |

APPEAL from a judgment and postjudgment order of the Superior Court of Los Angeles County, Malcolm H. Mackey, Judge.  Affirmed.

Lewis Brisbois Bisgaard & Smith, Roy G. Weatherup and Allison A. Arabian for Defendant and Appellant Elba Janeth Jimenez.

Dentons US and Charles A. Bird for Defendant and Appellant Maria Elena Rodriguez.

---

**\*** Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II and III of the Discussion.

Carpenter, Zuckerman & Rowley, Gary S. Lewis and John C. Carpenter for Plaintiffs and Respondents.

In this wrongful death action, a jury awarded the deceased's four children $11,250,000 each in noneconomic damages. Elba Janeth Jimenez, who killed the children's mother while driving drunk, and Maria Elena Rodriguez, who negligently entrusted her car to Jimenez, appeal the judgment on the ground it is excessive. Jimenez also contends that the trial court improperly awarded prejudgment interest. We affirm the judgment and postjudgment order.

## BACKGROUND

I.  The lawsuit

Claudia Fernandez died on June 16, 2012 when an intoxicated Jimenez lost control of her car and struck Claudia, killing her. Claudia's children sued Jimenez. They also sued Rodriguez, whose car Jimenez was driving, for wrongful death under a negligent entrustment theory.[1] At the jury trial, Jimenez, but not Rodriguez, conceded liability. The following evidence was elicited.

II.  Claudia's death

By June 16, 2012, Rodriquez and Jimenez had lived together for five years but had known each other longer. On that day, they were at a party where Rodriguez saw Jimenez have at least three shots of tequila. When they left the party, Jimenez drove them in one car to Jimenez's mother's house where

---

[1] Plaintiffs sued other entities and people, but they were dismissed before trial and are not parties to this appeal.

Rodriguez had left her second car. Jimenez refused to give Rodriguez the keys to the car and drove away. Soon thereafter, a police officer noticed Jimenez driving erratically. She evaded him, exited the freeway, and crashed into a taco truck, where Claudia was buying food. Jimenez killed Claudia and one other person.[2]

Although Rodriguez admitted to a police officer the day after the accident that she felt Jimenez was not okay to drive, Rodriguez maintained at trial that she saw nothing in Jimenez's behavior and knew of nothing in Jimenez's history to lead her to believe Jimenez was too drunk to drive that night.

When she died, Claudia was just 38 years old and the single mother of four children: Rachel Fernandez, Jeremy Valle, Donovan Valle, and Ryan Valle.[3]

III. Rachel

At the time of the accident, Rachel was 22 years old. She was 26 at trial. Rachel described Claudia as a "cool mom" and her best friend. Claudia always wanted to have family time, and one of the things they liked to do together was go to the movies. Claudia and Rachel particularly loved shopping together. Rachel described her mother as a hard worker who worked at an animal

---

[2] Jimenez was convicted of two counts of second degree murder, of evading an officer, of driving under the influence (DUI), and of DUI with a blood alcohol level over .08 causing injury. Jimenez is serving a 30-year-to-life sentence for the murders.

[3] We refer to Claudia and her children by their first names for the sake of clarity, intending no disrespect.

hospital.  Claudia was organized and provided the structure that is now missing from their lives.  Claudia also provided emotional support.  When Rachel was a senior in high school, she had low self-esteem and was trying to lose weight before prom.  One day, Rachel discovered Post-its on her bedroom walls telling her she was beautiful.

When the accident happened, Rachel was living on her own and studying child development at college.  Sometimes her mother would bring her lunch.  After her mother died, Rachel stopped attending college because she could not concentrate and lost interest in working with children.  She also stopped working for several months.  Although she wants to return to school, she now does in-home care for people with disabilities.  Her goal is to become a nurse.

When her mother died, Rachel "checked out."  But, when it came time for her brothers to go back to school, she "clocked back in" because "it had to be done.  They had to go to school."

Although the extended family thought the boys should live with their grandmother, Rachel decided to raise her brothers, so she obtained legal custody of them.  In many ways, this has made her a better person:  she is more responsible and has a different perspective on life.  Still, she feels that her life is on hold.

Although Rachel and her brothers had a good sibling relationship when their mother was alive, Claudia's death has driven a wedge between them.  Her death put a lot of pressure on them, and Jeremy, as the oldest boy, has felt it especially.  While Rachel can control her youngest brother, Ryan, she cannot control Donovan and Jeremy.

The siblings went to grief counseling once, but they did not like talking to a stranger. Rachel felt it did not help her. Rachel and Jeremy also had some joint sessions.

The children visit their mother's grave on Mother's Day, Father's Day, Claudia's birthday, and Christmas. Rachel explained, they visit on Father's Day because Claudia "played both roles."

Rachel still misses family dinnertime when they would talk about their day, waking on Sunday mornings to loud Mexican music, and her mother's laughter.

IV.    Jeremy

When his mother died, Jeremy was 14 years old and was finishing his sophomore year in high school. At that time he had C's and D's in his classes. He had a D average his junior year, and a C average his senior year. After Claudia died, Jeremy lost interest in school and did not graduate because he was not "emotionally" "okay." Rachel encouraged him to enroll in adult school, but he quit after a week.

Currently, Jeremy is a professional gamer and is developing a game for kids. He first got into gaming when his mother bought him a Nintendo 64.

Grief counseling helped him a "small amount."

Claudia had a boyfriend whom Jeremy considered to be his father, but he left when Claudia died.

When his mother was alive, they had family picnics at the park. Jeremy described his former family life as what one sees in films and reads about in books: "[w]e actually did that."

V.    Donovan

At the time of his mother's death, Donovan was 12 years old.  At trial, he was 16 years old.  Since Claudia died, he has attended three high schools because they moved a lot.  Donovan is always napping.  After school, he comes home and naps.  Then he gets up and plays video games or watches TV until 1:00 a.m. or 2:00 a.m., when he goes to sleep.

Donovan was not like this when Claudia was alive, when he had, in his words, a "happy life."  He and his mom had special routines; for example, every time she took him to the dentist, they would eat at Tom's Jr. Burgers.  Claudia had Donovan play baseball, and she was always with him.  But now he, like his brothers, is into TV, which Rachel thinks is a form of distraction.

Although Donovan is smart, Claudia was the one who motivated him.  He had been getting A's and B's when his mother was alive.  With her gone, Donovan is passing only five of his eight classes.

Donovan has shut down after his mom died.  He keeps his feelings inside and has anger issues, and Rachel fears he will blow up.  Before, Donovan used to walk away when he was mad but now he can become physical.  Once, he hit a wall and dented it, and he has fought with Jeremy.

VI.   Ryan

Ryan was 10 years old when his mother died.  At trial, he was 14 years old and a freshman in high school.  Ryan has a hearing disability and kids take advantage of him.  Ryan had grief counseling in middle school.  Now, his goal is to pass his classes.

6

VII. The jury's verdict and posttrial motions

The jury found that Rodriguez negligently entrusted her car to Jimenez. The jury awarded Claudia's children $11,250,000 each in noneconomic damages, comprised of $5,625,000 for past damages and $5,625,000 for future damages. The total damage award therefore was $45 million.

Rodriguez and Jimenez moved for a new trial on the ground, among others, that the damages were excessive. The trial court denied the motion.

Based on defendants' failure to accept a settlement offer under Code of Civil Procedure section 998 (998 offer), plaintiffs filed a memorandum of costs asking for $7,145,376 in prejudgment interest. Defendants moved to tax costs on the ground they never received the 998 offer. The trial court denied the motion.

**DISCUSSION**

I. Excessive damages

In a wrongful death action, "damages may be awarded that, under all the circumstances of the case, may be just." (Code Civ. Proc., § 377.61.) A plaintiff in a wrongful death action is entitled to recover damages for his or her pecuniary loss, "which may include (1) the loss of the decedent's financial support, services, training and advice, and (2) the pecuniary value of the decedent's society and companionship." (*Nelson v. County of Los Angeles* (2003) 113 Cal.App.4th 783, 793.) However, the plaintiff may not recover for the grief or sorrow attendant upon the death of a loved one, or for his or her sad emotions and for the sentimental value of the loss. (*Ibid.*) "Factors relevant when assessing a claimed loss of society, comfort, and affection may include the

7

closeness of the family unit, the depth of their love and affection, and the character of the deceased as kind, attentive, and loving." (*Mendoza v. City of West Covina* (2012) 206 Cal.App.4th 702, 721.) "The pecuniary value of the society, comfort, and protection that is lost through the wrongful death of a spouse, parent, or child may be considerable in cases where, for instance, the decedent had demonstrated a 'kindly demeanor' toward the statutory beneficiary and rendered assistance or 'kindly offices' to that person." (*Corder v. Corder* (2007) 41 Cal.4th 644, 661–662.)

The amount of damages to be awarded is a question of fact committed, first to the discretion of the trier of fact, and then to the discretion of the trial court on a motion for new trial. (*Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506 (*Seffert*).) An appellate court gives great weight to the determinations of the jury and the trial court. (*Id.* at pp. 506–507.) "The amount to be awarded is 'a matter on which there legitimately may be a wide difference of opinion.'" (*Id.* at p. 508.) We can interfere if the verdict is so large that, "at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury." (*Id.* at p. 507.) There is no fixed standard by which we can determine whether a jury's award for this intangible loss of comfort and society is excessive. (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 615.) In the absence of some factor in the record such as inflammatory evidence, misleading instructions or improper argument by counsel that would suggest the jury relied upon improper considerations, we usually defer to the jury's discretion. (*Ibid.*) The fact that the verdict is very large does not alone compel the conclusion the award was attributable to passion or prejudice. (*Ibid.*) In assessing a claim that the jury's award of damages is excessive, we do not reassess

the credibility of witnesses or reweigh the evidence. We consider the evidence in the light most favorable to the judgment, accepting every reasonable inference and resolving all conflicts in its favor. (*Westphal v. Wal-Mart Stores, Inc.* (1998) 68 Cal.App.4th 1071, 1078.)

Here, Rodriguez and Jimenez, either collectively or individually, make four arguments why the damage awards should be reversed: they shock the conscience when compared to other verdicts, plaintiffs' counsel preconditioned the jury to award large damages, counsel introduced evidence about Jimenez's prior DUI, and counsel improperly urged the jury to punish Jimenez.

A. *Comparative analysis*

Jimenez and Rodriguez contend that an award of $11,250,000 to each plaintiff shocks the conscience when compared to other verdicts. Comparing verdicts, however, is of limited utility. While an appellate court "should consider the amounts awarded in prior cases for similar injuries, obviously, each case must be decided on its own facts and circumstances. Such examination demonstrates that such awards vary greatly. [Citations.] Injuries are seldom identical and the amount of pain and suffering involved in similar physical injuries varies widely." (*Seffert, supra,* 56 Cal.2d at p. 508.) Our California Supreme Court reiterated this point in *Bertero v. National General Corp.* (1974) 13 Cal.3d 43. There, in reference to the defendants' compilation of judgments which had been reversed as excessive, the court stated, "Those cases do not, in and of themselves, mandate a reversal here. The vast variety of and disparity between awards in other cases demonstrate that injuries can seldom be measured on the same scale. The measure of damages

9

suffered is a factual question and as such is a subject particularly within the province of the trier of fact. For a reviewing court to upset a jury's factual determination on the basis of what other juries awarded to other plaintiffs for other injuries in other cases based upon different evidence would constitute a serious invasion into the realm of factfinding. [Citations.] Thus, we adhere to the previously announced and historically honored standard of reversing as excessive only those judgments which the entire record, when viewed most favorably to the judgment, indicates were rendered as the result of passion and prejudice on the part of the jurors." (*Id.* at p. 65, fn. 12; see *Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1067–1068, fn. 17 [awards in other cases of no value in assessing propriety of damages in case before it].) *Seffert*, *Bertero*, and *Pool* thus instruct that other verdicts may have some slight relevance, but each verdict stands or falls on its own merits.[4]

A review of just a few cases the parties cite demonstrates why comparing verdicts is of limited value, given the varying facts, circumstances, and procedural postures. One Court of Appeal upheld a jury award of $2 million to each of the three deceased's adult children where there was evidence they had a close relationship. (*Soto v. BorgWarner Morse TEC Inc.* (2015) 239 Cal.App.4th 165, 172–173, 181–183.) Another Court of Appeal upheld a jury award of $750,000 to each of the deceased's two adult children even though they had not seen their father in years and only maintained their relationship by phone.

---

[4] Based on *Seffert*, *Bertero*, and *Pool*, we deny Jimenez's request for judicial notice of verdicts in other cases and of the consumer index price inflation calculator.

10

(*Mendoza v. City of West Covina, supra,* 206 Cal.App.4th at pp. 706, 720–721.) In *Shore v. Gurnett* (2004) 122 Cal.App.4th 166, a drunk driver killed a bicyclist, whose wife and two sons then sued for wrongful death. The jury awarded them $7.5 million in compensatory damages, which were not challenged on appeal. (*Id.* at p. 170.) *Boeken v. Philip Morris USA Inc.* (2013) 217 Cal.App.4th 992, 996 upheld a judgment of $12.8 million for loss of consortium to the decedent's son against an instructional error challenge. An older case upheld a $1.5 million award of compensatory damages to the decedent's disabled minor child. (*Fagerquist v. Western Sun Aviation, Inc.* (1987) 191 Cal.App.3d 709, 726–727.)

These cases, like the one before us, involve the loss of a parent. Still, they are of marginal use in evaluating whether $11,250,000 to each of Claudia's four children is excessive. None of the cases or the ones the parties cite involve the murder of a loved and loving single mother, whose death has made orphans of four children, three of whom were then minors. The youngest, Ryan, was just 10 years old when his mother died. If he has a normal life expectancy, he will have suffered her absence for perhaps 30 years or more, as Claudia was just 38 years old when she was killed. Jeremy and Donovan were both still in school when Claudia died. Their deteriorating academic and social lives reflect the absence of her guidance and motivating presence. As for Rachel, she has made the weighty decision to be both mother and sister to her brothers, thereby forever altering her life trajectory. Further, the undisputed evidence is that each child was individually close to Claudia and that they were a tight-knit family unit. We cannot conclude that, on these facts, the verdict shocks the conscience.

11

B.    *Preconditioning the jury*

Jimenez and Rodriguez contend that plaintiffs' trial counsel improperly preconditioned the jury during voir dire to award inflated damages, and Jimenez further argues that such preconditioning amounted to attorney misconduct.[5]  We disagree.

Attorney misconduct is an irregularity in the proceedings and a ground for a new trial.  (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 870.)  To preserve for appeal an instance of misconduct of counsel during voir dire, an objection must have been lodged and the objecting party must also have moved for a mistrial or sought a curative admonition unless the misconduct was so persistent that an admonition would have been inadequate to cure the resulting prejudice.  (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 794–795.)  Even where there is misconduct, the moving party must demonstrate that the misconduct was prejudicial so as to justify a new trial.  (*Id.* at p. 800.)

In a civil jury trial, the judge "shall permit liberal and probing examination calculated to discover bias or prejudice with regard to the circumstances of the particular case."  (Code Civ. Proc., § 222.5, subd. (b)(1).)  Improper questioning during voir dire includes any "question that, as its dominant purpose, attempts to precondition the prospective jurors to a particular result, indoctrinate the jury, or question the prospective jurors

---

[5] Jimenez refers to this as "anchoring," where counsel suggests a high damage figure as a starting point.  (See generally Chapman & Bornstein, *The More You Ask for, the More You Get: Anchoring in Personal Injury Verdicts* (1996) 10 Applied Cognitive Psychology 519.)

12

concerning the pleadings or the applicable law." (*Id.*, § 222.5, subd. (b)(3).)  Examination of prospective jurors should not be used " ' "to educate the jury panel to the particular facts of the case, to compel the jurors to commit themselves to vote a particular way, to prejudice the jury for or against a particular party, to argue the case, to indoctrinate the jury, or to instruct the jury in matters of law." ' " (*People v. Fierro* (1991) 1 Cal.4th 173, 209.)

Here, defendants argue that plaintiffs' trial counsel preconditioned the jury to award high damages by asking if they would be okay awarding $200 million dollars.  Or, as Rodriguez puts it, counsel encouraged jurors to think they were playing with Monopoly money by introducing the $200 million number. Plaintiffs' counsel, however, did not introduce that number. Rather, when a juror said she could be fair, counsel told the jury that plaintiffs may be asking for "hundreds of millions of dollars collectively for four of them" and asked whether that shocked anyone.  Juror No. 14 and, it appears, the jurors generally, agreed that was a shocking number.  When plaintiffs' counsel then asked if anybody thought they could not "have a judgment of hundreds of millions of dollars," the trial court sustained defense counsel's objection and said it would instruct the jury on what factors to consider in awarding damages.  A juror then asked if the question was whether he could award "$200 million-plus" and the trial court pointed out that "we don't know the amount."  The trial court then framed the question:  "Could you award substantial damages" if the facts called for it?  When plaintiffs' counsel pressed as to what trouble jurors would have with a demand in the hundreds of millions of dollars, the trial court

13

repeated that "we're not getting into that." A prospective juror[6] then commented, "I couldn't even imagine hundreds of millions of dollars."

Plaintiffs' counsel then told the jurors that they could not consider whether defendants "could afford it or not," and the trial court added that whether someone can afford to pay a judgment was not a proper question. Counsel, however, said the point of the questions was to tell jurors to make a decision about the value of plaintiffs' loss without "considering the consequences of the poverty of the defendant." Upon a juror's further inquiry about collecting judgments, the trial court repeated that "[w]e don't get into collecting" and that the jury would be instructed on that issue.

Based on this voir dire, defendants moved for a mistrial, but the trial court denied the motion. Thereafter, plaintiffs did ask for $200 million, or $50 million for each plaintiff.

This background shows that plaintiffs' trial counsel did not introduce that number. A juror introduced it. In any event, this was not improper preconditioning. Jurors may be informed of the damages a plaintiff seeks. (*Beagle v. Vasold* (1966) 65 Cal.2d 166, 170–171; Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2018) ¶¶ 5:311, 5:312, p. 5-74.) As to counsel's admonishment that the jury should not consider the defendants' financial circumstances, it is proper to ask prospective jurors whether they will apply the law as instructed by the trial court. (See *People v. Tolbert* (1969) 70 Cal.2d 790, 812.)

---

[6] The reporter's transcript indicates that a witness made the statement, but we assume it was a juror.

14

Moreover, even if informing prospective jurors that plaintiffs were seeking hundreds of millions of dollars and that jurors should not consider defendants' financial circumstances was error, it was not prejudicial. To evaluate prejudice, we examine " 'the entire case, including the evidence adduced, the instructions delivered to the jury, and the entirety of [counsel's] argument,' in determining whether misconduct occurred and whether it was sufficiently egregious to cause prejudice. [Citation.] 'Each case must ultimately rest upon a court's view of the overall record, taking into account such factors, inter alia, as the nature and seriousness of the remarks and misconduct, the general atmosphere, including the judge's control, of the trial, the likelihood of prejudicing the jury, and the efficacy of objection or admonition under all the circumstances.' " (*Garcia v. ConMed Corp.* (2012) 204 Cal.App.4th 144, 149.)

We cannot agree that the limited voir dire at issue inflamed the passions of the jury, especially given the evidence we detailed above. The jury awarded much less than $50 million per plaintiff, suggesting the plaintiffs' demand for $200 million did not inflame the jury's passions. Moreover, the trial court instructed the jury that no specific amount was yet before it, and the jury was otherwise properly instructed on damages with CACI Nos. 3901 (introduction to tort damages, liability established), 3902 (noneconomic damages), 3905 (items of noneconomic damage), and 3921 (wrongful death of an adult). The trial court also instructed the jurors not to consider punitive damages to punish defendants (CACI No. 3924).

C.  *Jimenez's prior DUI conviction*

Jimenez had a prior DUI conviction from 2005. Rodriguez was in the car with Jimenez during the events underlying that

15

conviction.  Before trial, plaintiffs sought to introduce the conviction to establish Rodriguez's knowledge about Jimenez's "decision making" when she is intoxicated.  The trial court excluded the evidence under Evidence Code sections 1101, subdivision (a), and 352.  At trial, plaintiffs' counsel asked Rodriguez about that conviction.  Jimenez—but not Rodriguez—now contends that plaintiffs' counsel deliberately tried to inflame the jury's passions by asking Rodriguez about the excluded evidence.

We do not agree.  At trial, plaintiffs' counsel asked Rodriguez if she had ever been a passenger in a car driven by Jimenez while Jimenez was intoxicated.  Rodriguez said she had not.  When plaintiff's counsel then asked, "Not even in 2005?" Defense counsel objected, citing the in limine ruling, and the trial court sustained the objection.  Plaintiffs' counsel then moved to impeach and asked the question again.  Rodriguez now answered, "Yes, now I remember."  She also answered yes, that Jimenez had been convicted of a DUI based on the incident.[7]  Defense counsel did not object to these questions.

The motion in limine did not preclude this evidence.  Once Rodriguez denied ever having driven with an intoxicated Jimenez, the conviction no longer was the issue; Rodriguez's credibility was the issue.  Jimenez's conviction and that Rodriguez was with her during the events underlying the conviction directly spoke to that issue.  Moreover, defense counsel did not object to the follow-up questions, which elicited that Rodriguez knew about Jiminez's prior DUI conviction.  We

---

[7] Plaintiffs' counsel referenced the DUI in closing arguments.

16

therefore do not agree that plaintiffs' counsel blatantly disregarded the trial court's evidentiary rulings to inflame the passions of the jury.

We also fail to see how this limited impeachment evidence was inflammatory. Jimenez had conceded liability for Claudia's wrongful death, and the jury knew that Jimenez was serving a substantial sentence in prison for second degree murder. That Jimenez had a prior DUI was not inflammatory vis á vis this other evidence.

D. *Punishment*

Rodriguez next argues that plaintiffs improperly engaged the passions of the jury by setting a theme of punishment in opening statement and in closing argument. In his opening statement, counsel explained that Rodriguez negligently let Jimenez drive Rodriguez's car, knowing that Jimenez was drunk. However, Rodriguez "wants to wash her hands of the death of these people."[8] Counsel continued that Rodriguez denied responsibility for giving her car to Jimenez but Rodriguez nonetheless bore responsibility for Claudia's death and "cannot wash her hands."

Counsel repeated that refrain in his closing statement. After going through the special verdict questions, counsel argued that Rodriguez played a role in Claudia's death and "can't wash her hands of it" and "needs to know that what she did was wrong." Counsel immediately then discussed the consequences of Rodriguez's behavior, i.e., how much money would reasonably

---

[8] At this point, defense counsel objected and the trial court told plaintiffs' counsel to "stick to facts."

17

compensate plaintiffs for the loss of their mother.  In concluding, counsel likened Claudia to a valuable, one-of-a-kind piece of art.  What defendants took "from this family is really, really, really valuable.  And our community has said so, and said so loudly and said so clearly so she could hear it loud and clearly, too, so she won't be walking around saying, 'I did nothing wrong.' "

Viewing counsel's statements in the context of his whole argument (see *People v. Centeno* (2014) 60 Cal.4th 659, 667), he was arguing that Rodriguez bore responsibility for Claudia's death, and hence could not "wash her hands" and escape paying damages.  He was not arguing that Rodriguez should be punished.  Indeed, the jury was instructed with CACI No. 3924 not to award damages to punish or to make an example of defendants.  We therefore see no argument, much less a "theme," that any defendant had to be punished.

II.    Apportionment of damages

In a wrongful death action, "[t]he court shall determine the respective rights in an award of the persons entitled to assert the cause of action."  (Code Civ. Proc., § 377.61.)  Thus, after a jury trial, the trial court apportions the award among the plaintiffs.  However, this rule is a procedural, not jurisdictional, one.  (*Corder v. Corder*, *supra*, 41 Cal.4th at p. 652.)  As such, it can be waived.  (*Ibid.*)  Defendants waived or forfeited any right to have the trial court apportion the judgment.  While reviewing the proposed special verdict, plaintiffs' counsel said the jury either could award damages to each plaintiff or it could award a lump sum and have the trial court divide damages among them.  The only concern defense counsel then raised was about a proposed instruction directing jurors to award a single amount for all plaintiffs and stating that the trial court would divide the

amount.  Defense counsel agreed to strike that portion of the instruction so that the jurors could award damages to each plaintiff individually.  The trial court then instructed the jury that each plaintiff was entitled to separate consideration of his or her claims.  Defense counsel therefore assented to the jury apportioning damages.

III.    The 998 offer and prejudgment interest

A 998 offer is an offer to compromise.  If a plaintiff makes a 998 offer to settle a lawsuit that the defendant does not accept, and the plaintiff then obtains a more favorable judgment, the defendant must pay various costs, including prejudgment interest at a rate of 10 percent from the date of the offer.  (Civ. Code, § 3291.)  Here, each plaintiff mailed a 998 offer to Rodriguez and Jimenez to compromise the action for $1 million ($4 million total).  The same day, plaintiffs mailed 998 offers to the dismissed defendants who are not parties to this appeal.  Rodriguez and Jimenez, who were represented by the same counsel below, did not respond to the 998 offers, although at least one nonappealing defendant did respond.  When plaintiffs obtained a recovery larger than their 998 offers, they asked for prejudgment interest in their memorandum of costs.  Rodriguez and Jimenez moved to tax the prejudgment interest, claiming that their counsel never received the 998 offers.  The trial court denied the motion.

Jimenez now contends that prejudgment interest should not have been awarded for two reasons.  First, her defense counsel never received the 998 offers.  Second, they were invalid as unreasonable.

19

A. *Receipt of the 998 offers*

Evidence Code section 641 creates a rebuttable presumption that a letter correctly addressed and properly mailed has been received in the ordinary course of mail. "The effect of a presumption affecting the burden of producing evidence is to require the trier of fact to assume the existence of the presumed fact unless and until evidence is introduced which would support a finding of its nonexistence, in which case the trier of fact shall determine the existence or nonexistence of the presumed fact from the evidence and without regard to the presumption. Nothing in this section shall be construed to prevent the drawing of any inference that may be appropriate." (Evid. Code, § 604.) The presumption may be rebutted by the intended recipient's denial of receipt. (*Bear Creek Master Assn. v. Edwards* (2005) 130 Cal.App.4th 1470, 1486.) In that case, the trier of fact weighs the denial against the inference of receipt from proof of mailing and decides whether the letter was received. (*Craig v. Brown & Root, Inc.* (2000) 84 Cal.App.4th 416, 422.) "Although the presumption disappears where . . . it is met with contradictory evidence, inferences may nevertheless be drawn from the same circumstances that gave rise to the presumption in the first place." (*Id.* at p. 421.)

Per the proofs of service attached to the 998 offers, plaintiffs were entitled to the presumption under Evidence Code section 641. However, Jimenez rebutted that presumption by submitting evidence she never received the 998 offers. Defendants submitted declarations describing how defense counsel's mailroom forwards settlement offers to the handling attorney's assistant with a high priority. Trial counsel's assistant denied seeing a 998 offer in the case. Otherwise, she would have

20

scanned the offers, emailed them to the insurance adjuster, and given copies to the handling attorney. She also would have sent a letter to the carrier advising it of the 998 offers. Defendants' trial counsel also denied receiving plaintiffs' 998 offers. Further, he denied receiving the fifteen other 998 offers that plaintiffs made to the nonappealing defendants.

In these respects, this case is like *Bonzer v. City of Huntington Park* (1993) 20 Cal.App.4th 1474. In *Bonzer*, the City of Huntington Park moved for relief under Code of Civil Procedure section 473, claiming it had not received notice of a hearing. The city submitted extensive evidence from, among others, mailroom staff, a secretary, and the chief of police stating it had not receive notice of a hearing. *Bonzer* found that the presumption under Evidence Code section 641 had been rebutted. The "only remaining effect of the '[p]roof of [s]ervice' declaration was to enable the trial court to draw 'any inference that may be *appropriate*.' " (*Bonzer*, at p. 1481.) Up to this point, we agree with *Bonzer*.

Where we part ways with *Bonzer v. City of Huntington Park*, *supra*, 20 Cal.App.4th 1474 is in its application of the standard of review. *Bonzer* went on to hold that, in light of the city's evidence, any inference that notice had been received was inappropriate, under Evidence Code section 604. To similarly reach that conclusion here would contravene the standard of review. Although we review de novo whether the civil costs statute permits a party to claim an expense as a reimbursable cost, we otherwise review a trial court's ruling on a motion to tax costs for abuse of discretion. (*Naser v. Lakeridge Athletic Club* (2014) 227 Cal.App.4th 571, 575–576; *Crews v. Willows Unified School Dist.* (2013) 217 Cal.App.4th 1368, 1379.) Under the

21

deferential abuse of discretion standard, we may reverse only if we conclude that the trial court's decision was so irrational, arbitrary or capricious that no reasonable person could agree with it. (*Ghadrdan v. Gorabi* (2010) 182 Cal.App.4th 416, 421.)

Here, the trial court weighed plaintiffs' evidence that on the same day they mailed multiple 998 offers to Rodriguez and Jimenez and to the nonappealing defendants, against Jimenez's evidence that her attorney received none of the offers. The trial court made an express credibility determination that, notwithstanding defendant's evidence, "I am going to find that you did receive it. I am listening to the testimony here, and you did receive it." Such a credibility call is binding on appeal. (*Craig v. Brown & Root, Inc.*, *supra*, 84 Cal.App.4th at p. 421.) Thus, even if we agreed that the evidence was in equipoise, we would not find the trial court's conclusion to be arbitrary or capricious, given its credibility determination and that there was a substantial basis for its conclusion, i.e., the proofs of service.

B.      *Reasonableness of the 998 offers*

Next, Jimenez contends that the 998 offers were unreasonable because plaintiffs knew that the policy limit was $15,000 and that she was otherwise in prison with no assets or ability to pay. We do not agree that these factors rendered the 998 offers invalid.

Rather, a 998 offer is valid if made in good faith. (*Licudine v. Cedars-Sinai Medical Center* (2019) 30 Cal.App.5th 918, 924.) Its reasonableness is determined by considering the circumstances when the offer was made and the information used to evaluate it. (*Elrod v. Oregon Cummins Diesel, Inc.* (1987) 195 Cal.App.3d 692, 699.) Reasonableness generally is measured by first determining whether the offer represents a reasonable

prediction of the amount of money, if any, defendant would have to pay plaintiff after a trial, discounted by an appropriate factor for receipt of money by plaintiff before trial, all premised on information that was known or reasonably should have been known to the defendant, and if an experienced attorney or judge, standing in the defendant's shoes would place the prediction within a range of reasonably possible results, the prediction is reasonable. (*Whatley-Miller v. Cooper* (2013) 212 Cal.App.4th 1103, 1112–1113.) Second, was plaintiff's information known to defendant? (*Id.* at p. 1113.)

As to the first inquiry, the 998 offers of $1 million for each plaintiff were clearly within the range of reasonably possible results. Indeed, Jimenez's cases cited in her opening brief establish that million dollar judgments for the loss of a parent is a reasonable prediction. (See, e.g., *Soto v. BorgWarner Morse TEC Inc.*, *supra*, 239 Cal.App.4th 165.) Moreover, where, as here, the offeror obtains a judgment more favorable than its offer, the judgment constitutes prima facie evidence the offer was reasonable. (*Elrod v. Oregon Cummins Diesel, Inc.*, *supra*, 195 Cal.App.3d at p. 700.) As to the second inquiry, Jimenez makes no argument that there was information about plaintiffs she did not know that would have been necessary to evaluate the offer.

Rather, Jimenez's sole basis for arguing the offers were unreasonable is her inability to pay. However, the reasonableness of a 998 offer is based on what the victim might reasonably get at trial. Reasonableness of what a plaintiff's claim is worth is not dependent on what the defendant can afford or what the plaintiff ultimately may be able to collect. Stated otherwise, a tortfeasor's financial status does not circumscribe the reasonableness of an offer. Jimenez's policy limit of $15,000

thus does not bear on the reasonableness of the 998 offers.  By such logic, would any 998 offer above a minimal amount to an uninsured driver be unreasonable?**9**  Clearly, the answer is no.

## DISPOSITION

The judgment and postjudgment order are affirmed. Respondents are awarded their costs on appeal.

CERTIFIED FOR PARTIAL PUBLICATION.


DHANIDINA, J.


We concur:


EDMON, P. J.


HANASONO, J.**\***

---

**9** Where the record shows that a plaintiff has reason to believe an insurance company may be liable for a judgment in excess of its policy limits, that may speak to a plaintiff's good faith belief in making a 998 offer in excess of such limits. (*Aguilar v. Gostischef* (2013) 220 Cal.App.4th 475.)  We have no such record here and make no comment on whether one could be made.

**\*** Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

24